United States v. Douglas-Willan Sartoris Co.

UNITED STATES v. DOUGLAS-WILLAN SAR-
TORIS CO.

(June 6, 1889.)

PUBLIC LANDS—POLICE POWER.

1. Defendant, owning a number of sections of land designated by odd numbers, the title to the alternate or even-numbered sections being still in the government, undertook to inclose a part of its lands by a series of fences erected wholly within the limits of its own property, the practical effect of which, however, was to inclose with it many of the even-numbered sections of public land. In a proceeding by the United States for injunction, under Act Cong. Feb. 25, 1885, (23 U. S. St. 1883-85,) declaring unlawful the inclosure of public lands made by any person without claim or color of title to any portion of the lands so inclosed, *held*, (per SAUFLEY, J.,) that the statute, so far as it forbids, as a nuisance, the erection by defendant of a fence wholly within the limits of its own land, is not a legitimate exercise of the police power, but an unwarranted invasion of private property, and is unconstitutional and void.[1]

2. Per CORN, J. Notwithstanding the apparent meaning of the language used, the act of February 25, 1885, was not intended to forbid the erection by a land-owner of a fence wholly within the limits of his own land.

MAGINNIS, C. J., dissenting.

Error to district court, Albany county.

This was a proceeding in equity by the United States to restrain defendant corporation from unlawfully inclosing public lands. The district court dissolved the temporary injunction, and dismissed the petition. The plaintiff brings error.

*A. C. Campbell,* U. S. Atty., and *Wm. W. Peck,* for plaintiff in error. *Brown, Blake & Arnold* and *Corlett, Lacey & Riner,* for defendant in error.

SAUFLEY, J., delivered the following separate opinion:

On the 1st day of July, 1862, the congress of the United States passed an act entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific ocean, and to secure to the government the use of the same for postal, military, and other purposes." By the first section of this act the Union Pacific Railroad Company was created, erected into a body corporate, and given the customary powers of a corporation. By the third section there was, in express terms, granted to the corporation, for the purpose of aiding in the construction of its line of railway, and for other avowed purposes, every alternate section of public land, des-

ignated by odd numbers, to the amount of five alternate sections per mile, on each side of the line of railway, and within the limits of 10 miles on each side of the road. By supplemental legislation the grant was so extended as to comprise a belt of 40 miles, or 20 miles on each side of the road. It is agreed by counsel, as per statement of agreed facts on file, that whatever title the Union Pacific Railroad Company had in and to the aforesaid odd-numbered sections was regularly transmitted to the Union Pacific Railway Company, and by the latter transmitted to the Wyoming Land & Improvement Company, and by the last-named company to the defendant corporation.

The chief point of contention between the plaintiff and the defendant in error arises out of the asserted right of defendant to build and maintain upon its own land a fence which will operate as an inclosure of the public land. In other words, the complaint of the government is, substantially, that the Douglas-Willan Sartoris Company, with the sole and unlawful design of inclosing the lands of the government, has planned, already built, and proposes to build, a continuous line of barbed-wire fence, which, when completed, will have the effect to sever from the public domain over 200 even-numbered sections in 12 townships, situate in a compact body, and of the form of a quadrilateral. By those familiar with the frame-work of the rectangular system of surveying it is well understood that, after the initial point for the survey within a given surveying district is agreed upon, a principal base line is run east and west therefrom, on a true parallel of latitude. Beginning thereafter at the same initial point, a principal meridian is extended north and south therefrom. Lines, called "standard parallels," are then run every four townships, or 24 miles, north of the base line, and every five townships, or 30 miles, south of the base line. This being done, lines called "guide meridians" are surveyed at intervals of eight ranges, or 48 miles. The parallelograms thus formed are divided into townships, sections, and parts of sections. Each section of every township is numbered, beginning with the numeral 1, and ending with the number 36. For the purpose of this case, the section may be regarded as the unit of the rectangular system. From the pleadings and exhibits it sufficiently appears that the inclosure, as already built and threatened to be built, may be generally described as be-

[1] See note at end of case.

United States v. Douglas-Willan Sartoris Co.

ginning in section 35, township 17, range 76, and utilizing in its course certain linear fragments of pre-built fence of other parties, as well as the shores of certain lakes; running thence in a north-westerly course; thence deflecting eastwardly; thence north-westerly, until it reaches the northern section line of section 3, township 19, range 76; thence, on a comparatively right line, until it reaches the east line of section 3, township 19, range 75; and thence southerly, ranging south-westerly, until it reaches a point a few sections only from the beginning. The description is inexact, but may serve to illustrate, in the absence of a diagram, the principles of this opinion. By stipulation between the parties the following facts are agreed: That the fence already built is wholly on odd-numbered sections; that the fence proposed to be built will be, if completed, wholly on odd-numbered sections; that the entire line, if completed, will be about four inches from the section lines; that when the corner-stones, which mark the point of contact between the retained and granted sections, are reached, they will be leaped; and that the defendant has neither joined to them nor will join to them.

It is obvious, and in argument is so conceded, that the incidental effect of a fence so located will be to encompass the even-numbered sections of the public domain situate within this large area. The action, therefore, by the government, seeks, in a'd of ulterior purposes, the destruction of the fence already built, and a perpetual injunction against its completion on the lines indicated. It is brought under an act of the congress of the United States approved February 25, 1885, entitled "An act to prevent unlawful occupancy of the public lands." 23 U. S. St. 1883-85. The first section provides "that all inclosures of any public lands in any state or territory of the United States heretofore or to be hereafter made, erected, or constructed by any person, party, association, or corporation, to any of which lands included within the inclosure the person, party, association, or corporation making or inclosing the inclosure have no claim or color of title, made or acquired in good faith, or an asserted right thereto, by or under claim made in good faith, with a view to entry thereof at the proper land-office under the general laws of the United States at the time any such inclosure was or shall be made, are hereby declared to be unlawful, and the maintenance, erection, construction, or control of any such inclos-

ure is hereby forbidden and prohibited." The second section directs district United States attorneys, on complaint made, to institute civil suits against offending parties, confers jurisdiction upon territorial and other courts to hear and determine the complaint by proceedings in equity, and by writ of injunction, and by final judgment, to summarily decree the destruction of the inclosure. The remaining sections forbid the obstruction, by threats or intimidation, of a settlement on or transit over the public domain, fix penalties, and prescribe the duties of the president in relation to obstructions.

It is insisted by counsel for the defendant that the act quoted was not intended to prohibit, and does not in terms prohibit, that character of inclosure which results incidentally, though necessarily, from maintenance of a continuous line of fence built wholly on his own land, but was intended to forbid, and does forbid, only the construction of fences or other obstructions which are actually erected on land belonging to the government. The only argument advanced in support of this proposition is that, when a statute is susceptible of two constructions, one shall prevail which will not result in the violation of vested or constitutional rights. Counsel cite U. S. v. Brandestein, 32 Fed. Rep. 738, (opinion by Judge HOFFMAN, of the district court of California.) That action was instituted under the act of February 25th, just quoted. The point of contention between opposing counsel seemed to be whether the grant of land to the Southern Pacific Railroad by the act of June 27, 1866, was a grant *in præsenti*, or was in effect an agreement or provision that the title should in the future be conveyed to the corporation on the performance by it of certain conditions precedent. On this point of contention the learned judge pretermitted an expression of decided opinion, and held, in harmony with the view taken by counsel for this defendant, that the act was not intended to prohibit the erection of fences by the defendants on their own land, although such structure served to complete an inclosure of the public domain. My brother, Justice CORN, entertains an opinion similar to that of Judge HOFFMAN, predicating his views, as I understand them, upon the idea that, whatever may be the apparent meaning of the language of the statute, it will not be presumed that it was the legislative intent to forbid to an owner of land the right to erect a fence on his own property, unless

United States v. Douglas-Willan Sartoris Co.

United States v. Douglas-Willan Sartoris Co.

such intent be clearly expressed in the statute. The chief justice is of opinion that the act was intended to apply to the case of the defendant, and that it is a valid and constitutional enactment. I concur with the chief justice on the first branch of the propositions, and differ from him on the second.

If the interpretation which gives to the act so limited an application be correct, the inquiry suggests itself, what special object did congress have in enacting the first section of the act? A purpresture is an offense at common law, and, whether it does or does not amount to a nuisance, the courts of common-law jurisdiction have power to abate it, and in numerous instances an injunction will lie to prevent it; so, if the destruction and prevention of an inclosure, erected and to be erected solely on public lands, is the limit of the application of this act of congress, then to me it clearly appears that the distinctive feature of the entire enactment is supererogatory for, without and independently of the act, it is unlawful to erect an obstruction or inclosure on the public lands, unless a license so to do be expressly or impliedly given. Without it the courts of the United States have jurisdiction to decree their removal and to prevent their completion, and without it it is the duty of the United States district attorney to prosecute all civil actions that may be brought to suppress such wrongs. Certainly this was the law as it stood at the date of this enactment. It is not to be presumed that congress meant to be engaged in the idle work of phrase making. It is not to be presumed that a legislative body would enact a statute without other purpose than to declare what is already indisputably and confessedly the law. Besides, it seems that the language used shows that the act was intended to apply to cases such as we have at bar. What is forbidden? The inclosure — *i. e.*, the environment, the surrounding — of the public land, to any of which the party so inclosing has no title, claim, or color of title. Is there not here an environment, a surrounding, of land, incidental though it be, to which defendant expressly disclaims title? Of this there cannot exist a doubt. It is not the mere location of the fence, but its operation as an environment, which, under the act, is supposed to give to the United States this cause of action. I am therefore of the opinion that the act of February 25th was intended to apply, and does in its terms apply, to a character of inclosure of which that erected by the defendant and that which is contemplated is a fair type. I am, however, unable to perceive that the act of defendant, as so ably contended by counsel for the United States, is a public nuisance at common law, and therefore liable to abatement independently of the statute. That police power exists at common law; that it covers the whole subject of nuisance, and is adequate to its suppression,—is not denied. But the question for determination here is not the adequacy of the common law to afford relief against an already committed or a threatened nuisance; but, rather, is the defendant, in the commission of the act done by it, guilty of a nuisance? "Whatsoever unlawfully annoys or doth damage to another is a nuisance." Bl. Comm. bk. 3, p. 5. To constitute this fencing a nuisance at common law, it must, therefore, be unlawful with respect to the rights of the government, and it must be to the damage of the government. In what is the damage supposed to consist? Its existence, if discernible at all, is set forth in that portion of the argument of counsel which so earnestly affirms that the government must have free access to its domain for governmental purposes; that congress cannot anticipate what portion of the public land may or may not be needed for reserves, fortifications, arsenals, and depots; and that, if the practices of the defendant are sustained, then the government must depend for its own uses wholly upon private agreement, adjudications, or appropriations of private property under the constitution. And from this the conclusion is deduced that congress did not part with its sovereign power of control over the odd-numbered sections, which passed by its grant to the Union Pacific Railroad Company,—a conclusion which is at war with the principles of many well-considered opinions, both of state courts of last resort and of the supreme court of the United States.

It is no longer a question open to dispute that, when the government becomes a party to a contract between itself and its citizens, it divests itself of its sovereignty in respect to the terms and conditions of the contract, its construction and interpretation, and stands in the same position with reference to the contract as a private individual. As said by the supreme court of Massachusetts, (Com. v. Proprietors, 2 Gray, 350:) "If it were otherwise, the rights of parties contracting with the government would be held at the caprice of the

United States v. Douglas-Willan Sartoris Co.

sovereign, and exposed to all the risks * * * of misguided power." "When a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of moral agent, with the same rights and obligations as an individual. It is, in theory, impossible to reconcile the two ideas of a promise which obliges with a power to make a law which can vary the effect of it." Hamilton's Works, vol. 3, p. 518.

But, recurring to the question of damage: As appears, both in pleading and argument, this arises out of the need of the government to have free access to its own property for all the uses to which the domain may lawfully be applied. Why should not the government, in the language of its counsel, "depend, for its own use, upon private agreement, judicial adjudication, or appropriation of private property under the constitution?" The individual, similarly situated, would have to depend on these agencies, and there can surely be no serious contention that the government, in dealing with rights not its own, occupies a point of advantage distinct from or superior to that of any of its citizens. If A., owning a tract of 100 acres, should sell to B. the entire area, except 10 acres reserved in the centre, the fencing by B., either of his exterior or interior lines, could not, upon any principle or authority, be called a public or a private nuisance, to be abated by the power of the law. A. would be deemed to have a way of necessity to and from his reserved acreage, the designation of which primarily would lie with the owner of the servient estate. But surely A. could not be heard in a court of justice to demand that B. should destroy his entire fencing, to afford to him the privilege of unlimited ingress and egress wheresoever he listed. This, then, is the damage to the government,—that its freedom of access to its own land is obstructed by the fence which the defendant has erected on its own land. There is no other complaint in this action; there can be no other complaint. There is no other damage cognizable under the procedure adopted; there can be no other damage. And on this the government most singularly, according to my comprehension, contends that the defendant maintains a nuisance, because it should so use its own property as not to damage another.

It is true that the defendant may use the land of plaintiff, as it may, by the fence, obtain the benefit of the use to the exclusion of all other citizens for whom the government holds the public land in trust. But it is the actual use, and not the fence, which works the evil. That actual use would only render the defendant liable, if for anything, to the common-law action of trespass, and not to an equitable proceeding, by which its property is to be destroyed and its reconstruction forbidden. It should, therefore, be constantly kept in mind that, in the action as brought and prosecuted, it is not pretended that the damage results from defendant's actual and exclusive use of the public land, no matter how unlawful in fact that use may be, but from the erection of a fence on its own land which interferes with the agents and beneficiaries of the government. That the use of another's property, without his consent, is improper; that the law-making power may impose penalties for such use,—is not controverted; but that is not the question which arises in this case. The act under which the suit is prosecuted forbids two things: (1) The inclosure referred to; and (2) the assertion of a right to the exclusive use of public land without right or color of right. The actual use, as distinguished from the assertion of the right to use, is not forbidden. In a civil proceeding for the violation of this act there is no penalty prescribed, either for the use, or for the assertion of the right to use. The only judgment which can, under the act, be rendered in a civil suit, is for the destruction of the fence, and an injunction against its re-building. On this idea the petition is framed, having in view but one object, the destruction of the fence,—an object which is wholly separate and distinct from any use or asserted right of use. The fence thus presenting an artificial barrier, which impedes the travel by the public over land which the public does not own, how does the maxim, *sic utere tuo ut alienum*, have even the remotest application? The exercise of the repressive force of the police power of the sovereign presupposes that a public or a private wrong has been committed, or is about to be committed. Now, the act of the defendant in the erection of the fence is in itself lawful. On what known principle shall the defendant be liable to action, unless this act of erection unlawfully interferes with the right of another? The maxim cannot apply unless some legal right of the government has been violated; for it may be laid down as a princi-

United States v. Douglas-Willan Sartoris Co.

ple, impregnable to any assault either of reason or prevailing authority, that an act legal in itself, violating no right, cannot be made actionable in itself, on the ground of the motive which induced it. The law does not deal with abstract ideas or emotions; it does not punish an intent disassociated from an act. What is that legal right with the unlawful interference of which the defendant is charged? Ordinary analysis will show that it is an alleged right of way: a right of travel; a right to go upon lands which are private property. Whence did the government obtain such rights? From whom and when were they derived? If they exist by virtue of any law other than the law of physical force, and the defendant by its fence obstructs the free exercise of the least of them, then the use to the extent of the obstruction would be deemed unlawful. But these rights were not obtained by contract. They do not arise by operation of law. They are not inherent by reason of sovereignty.

In all governments of constitutional limitations, sovereign power manifests itself in but three ways: By exercising the right of taxation; the right of eminent domain; and through its police power. It is claimed with great earnestness that the case of defendant falls within the range of this last element of sovereignty. The range of this power is sweeping. The extent to which it may go, the limits within which it is circumscribed, cannot be defined by any formulated rule. That it extends to public morals, the health and safety of the citizens, and in special and peculiar cases to the conservation of public convenience, will be admitted. But without pausing in a fruitless attempt at a definition of the term, or to arrange the class of cases in which it may be invoked, it may be observed that, in republics, "sovereignty," no matter through what channel it may operate, has a legal signification, distinct from its philological import. In the former sense, it does not import those extensive attributes or prerogatives, the exercise of which is restrained only by discretion. The right of taxation is one of the most striking attributes of sovereignty. In this field government approaches the absolute. The rate, the subjects, the time, the mode, of taxation are wholly within the discretion of the law-making power. But that power has neither the legal nor the moral right to exact a tribute from one citizen to build up the trade or the fortunes of another; and, whatever may be the mask under which

such legislation is hidden, a court of justice will seize the disguise, and brand the enactment as robbery under the form of law. So, when the effort is made to take the citizen's property by invoking the police power of the government,—a power which proceeds in destruction with no returning compensation; when it is plain that, if taken at all, it should be through that other element of sovereignty, which refuses to even rudely touch until full compensation is made,—the duty of the courts is no less imperative.

By the congressional grant of 1862, the title to the odd-numbered sections therein described vested absolutely in the Union Pacific Railroad Company. The grant was made in an improvident fashion. The government established the rectangular system of surveying, and so separated the odd from the even numbered sections as to leave between them only a geometrical line. It thus made the possibility of a clash of whatever conflicting interests might ensue between it and its grantees, when that conflict could have been easily avoided by originally making the section lines, or the lines of alternate tiers of sections, the center of passways or common roads. Whose fault, therefore, is it that the opposing parties are involved in this dilemma? If blame shall rest anywhere, it must lay at the door of the government, which, being primarily the owner of the land, platted it, and then granted alternate sections to the railroad company. I do not charge that the congress is guilty of culpable negligence in making the grant without reserving the way, or providing the method by which free access could be had to retained sections, but it may not be amiss to call attention to that principle which estops one who is himself guilty of blame from invoking the maxim, *sic utere*, etc. The title thus obtained by the Union Pacific Company, and which has been transmitted to a remote vendee, carried with it the right to use, to enjoy, and to make profitable the thing granted. When a thing is given, the incidents which will enable the owner to utilize it, and to enjoy it to the exclusion of all the world, are also given, "that the thing may have value, rather than perish." Suppose these odd sections, instead of being owned by the defendant corporation, were owned by as many different persons, and each person should inclose, as he might certainly do, his own section. Could the government, under its police power, require them to pull down their inclosures, that

United States v. Douglas-Willan Sartoris Co.

some one else, or even the great body of the people, might have access to an adjacent territory? It most certainly could not. Each separate owner would be entitled, by every principle of justice, to perfect security in the enjoyment of his property, and of every use to which it could lawfully be applied. And yet, when each separate section is thus inclosed by the labor and for the better use of each individual freeholder, it is plainly to be seen, by a glance at the diagram, that the public sections would be as completely environed, as effectually severed from each other, and as unapproachable, as they will be should defendant complete the erection of the fence on the line proposed. It seems to be conceded by counsel for the government that the defendant would have the unquestioned right to completely inclose each one of its several sections,—that is, it might, without offense either to the statute or to common law, erect its fences along the four sides of the square; and yet, inconsistently enough, the proposition is advanced that the maintenance of a fence along one or two sides of the square is offensive to the law. In other words, a complete inclosure is not a nuisance, but a half inclosure is a nuisance. The contention of the government in this case, when carried to its logical sequence, not only runs into this absurdity, but leads to an absolute prohibition to the owners of the odd sections in a township to protect them by fences, lest the public have difficulty in getting to even-numbered in the same township. But suppose the relief sought by the government is obtained, what then will be the *status* of the parties? The fence already built is destroyed. An injunction forbids the completion of that which is proposed; and the whole country, in a physical sense, is thrown open. But is it in a legal sense thrown open to public travel? Is it the law or the fence which secures to the owner of property its exclusive enjoyment? The fence is made for beasts; the law is made for man. Though my field shall have never a rail upon it, yet my neighbor dare not make it his pathway without my consent. He cannot use my land any more than he can my horse. He cannot tramp my grass any more than he can cut my trees. The fence destroyed, what greater facility of access to the retained sections will the public then have than if the fence had remained? In the former case a physical obstacle would be out of the way, but a legal obstacle would remain. The former may be stepped over;

the latter presents an impassable barrier. This physical object is on defendant's land. Remove it, and the land still remains. Who shall go upon it without the owner's consent? Shall the government abase its sovereignty, and descend to the plane of the trespasser? When reduced to its last and its true legal analysis, the point in controversy is, shall the United States have a way over defendant's land? It is this, or it is nothing. Unquestionably the way may be obtained, but not by invoking the police power of the government. It must be bought and paid for in the manner and according to the methods prescribed for the condemnation of lands. Moreover, the line of pathway must be described and the transit of the public limited to the line. Surely no civilized government, even though it could through its police power obtain a public way, would ruthlessly destroy more fencing or commit greater injury than public exigency required. Surely it would not expose a vast domain to indiscriminate encroachment, and invite the public to a transit on whatsoever lines it willed; and yet, as I understand this record, this, though not avowedly, is practically, the end sought to be attained. It is needless to reaffirm, either in form or substance, that historical truth which has so often and so impressively been declared, by both the bench and the bar, that, excepting one notable instance, no government which rests on the basis of fixed laws, whatever its form, or wherever its sovereignty may reside, has ever asserted the right or lawfully exercised the power to appropriate private property to public use without compensation. I am therefore of the opinion that the act of February, 1885, in so far as it authorizes the destruction of defendant's fence, located as it is, is unconstitutional and void; wherefore, the chief justice dissenting, and Justice CORN concurring for reasons other than those appearing in this separate opinion, the judgment of the district court is affirmed.

MAGINNIS, C. J., (*dissenting.*) There are three things forbidden by this act of congress: The first is the inclosure of public lands, to any of which lands the person making the inclosure had no claim or color of title at the time of the erection of such inclosure. The second is the assertion of a right to the exclusive use and occupancy of public land to which the person making the assertion has no claim or color of title. The third is the obstruction to or the pre-

vention of the settlement of public land by means of a fence, threats, intimidation, or by any fencing or inclosing, or any other unlawful means. In this case the defendant in error has inclosed with a fence or a number of fences, erected so as to join within about six inches, tracts of land amounting to 81,440 acres, of which 38,720 acres unquestionably belong to the United States, and to which defendant in error admits that it has no claim or color of title. It has therefore inclosed public land, to some of which it has no claim or color of title. So far such inclosure is plainly in violation of the statute. But the fence which constitutes the inclosure is built upon land belonging to defendant. "Therefore," it says, "you can neither remove such fence, nor forbid the erection of similar ones in similar cases." I am not prepared to say that congress could in every case arbitrarily forbid the inclosing of lands, even when such inclosure necessarily includes public land to which the person erecting the inclosure has no claim or color of title, but if the inclosure is for any reason unlawful in itself, aside from the fact of merely inclosing such lands, then unquestionably this portion of the statute would be operative. If property is used for an unlawful purpose, then the sovereign power has the inherent right to abate such use, and it is well settled that such an abatement is no infringement upon what is commonly called the "private right of property." See the case of Rideout v. Knox, 148 Mass. 368, 19 N. E. Rep. 390. In that case it is held that "a statute making a private nuisance of any fence unnecessarily exceeding six feet in height, maintained for the purpose of annoying owners of adjoining property, is within the limits of the police power, and is constitutional in respect to fences erected before or after its passage." I take it that the unauthorized use of public property is per se unlawful. Such use, at the common law, as would amount to trespass in matters between individuals when public realty was seized, became the subject of an information for intrusion, (3 Washb. Real Prop. 191,) and indeed was not the subject of an action, either in trespass to try the title to land or in ejectment? It has been the policy of the United States government impliedly to consent to the use of all of its public lands by the public in common. Congress has seen fit in the act in question to revoke such consent in case a person attempts to exercise an exclusive use of such land. There can be no doubt of its power to do so. The person, then, who

exercises an exclusive use of any public land to which he has no claim or color of title, is necessarily engaged in an unlawful act, and any instrumentalities by which he asserts such right are also unlawful, and proper subjects of abatement. For this reason I am satisfied that it is a proper exercise of the legislative function to forbid the assertion (and by that is meant a substantial or material assertion) of a right to the exclusive use and occupancy of public land, to any of which the person making the assertion has no claim or color of title. There are numberless ways in which such an assertion might be made. If A. were to station armed men around a section of land, and forbid any one to go upon it, such act would unquestionably be an assertion of a right to the exclusive use and occupancy of such land, and just as unquestionably would it be unlawful in itself. So, if he erects a fence or barrier to the free ingress and egress of the persons entitled thereto, it would be such an assertion. The presumption conclusively arising from such acts would be that the person doing them does them for the purpose of using such land himself, for his own purposes, and as this was always and is now unlawful, the courts would properly be called upon to interfere. In my view, the facts in this case admitted lead irresistibly to a similar conclusion. It is undeniable and admitted that defendant has erected a fence which incloses a large amount of government land to which it has no claim or color of title. A large number of government sections are inside the fence, and only separated from it by about six inches; the fence being immediately between the government land and the uninclosed land outside. In the neighborhood of 10,000 acres are in this condition. There can be no question of any incidental use as to these sections. If the defendant did not care to inclose the sections upon which it put its fence, and which was excluded from the inclosure, then unquestionably the fence upon that section was not only not necessary for the inclosing of its own land, but could serve no legitimate purpose, except to inclose the government land. An examination of the diagram will tend to make this matter plainer. To illustrate more clearly: If A. were to obtain permission from the owner or owners of, say, sections 1, 3, 11, and 35 to erect a fence upon the sides of those sections, adjoining section 2, he could inclose section 2, belonging to the government, without any of the fence being upon such section, and without

### United States v. Douglas-Willan Sartoris Co.

any other land being in the inclosure. I apprehend it could not be contended that such an act upon his part would be lawful. The assertion of dominion over section 2, with just as little right, would be precisely the same as if the fence were all erected upon section 2. What is done in this case is equally indefensible. The odd-numbered sections in the diagram belong to the defendant; the even-numbered ones to the United States. A glance at the diagram will disclose that these sections, in their relations to one another, are as the squares in a checker-board. No two odd-numbered sections can be used together without also using the government sections. That this is so is not only apparent, but defendant admits it. If such two sections could be used together, they could be fenced together; and if they could be fenced together, they could be fenced with a continuous fence. This, defendant has not attempted to do, but leaves a space of about six inches between the different panels of fence where the section corners are, which space is sufficient to technically break the continuity of the fence, and yet not sufficient to prevent the land inside the numerous fences from being inclosed. The most charitable construction, therefore, which can be given these fences as they appear in the diagram, is that defendant, being possessed of these sections of land, has endeavored to use them all as one tract of land. In order to do so, however, he must also use their complement, the even-numbered or government sections, and in order to protect such use from interference it erects this fence. What stronger or greater assertion of the right to use the government land exclusively could there be than its inclosure by a fence with the obvious intention of using it?

It is argued that, if defendant cannot fence in this way, it will deprive it of the use of its property, since fencing each section separately is impracticable. Whatever question there may be about the advantage of fencing at all, there are two reasons why this point can have no force. The first is that when defendant bought these lands it took them with notice of their geographical position, and acquired no right of any kind in and to the government land it has inclosed; and the other, that, whatever may be the consequences of a decision, they can in no way affect the principles of law governing the case. It was also argued that, because it is impracticable to fence each section, if defendant cannot fence in

v.3wyo.—12

this way, then it is deprived of its property without either compensation or due process of law. Such argument has no force, if, as I view it, such fencing is erected in the pursuance of an unlawful purpose, viz., the unauthorized use of public land. The United States supreme court in the case of Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. Rep. 273, says: "The destruction, in the exercise of the police power of the state, of property used in violation of law, in maintaining a public nuisance, is not a taking of property for public use, and does not deprive the owner of it without due process of law." But the mere act of fencing its own land is not denied to defendant by this statute. It is not the fencing which violates the law; it is the assertion by means of the fence of a right to the exclusive use of government land that is forbidden. In no sense, then, can it be said that it is deprived of the use of its property for any lawful use. "Any proper exercise of governmental power which does not directly encroach upon the property of an individual, or disturb him in its possession or enjoyment, will not entitle him to compensation, or give him a right of action." Commissioners v. Armstrong, 45 N. Y. 245; Gould v. Railroad Co., 6 N. Y. 522.

It was suggested upon the argument that gates had been left at certain points in this inclosure for the convenience of any person desiring to settle upon the government land. This suggestion was presumably made as a disclaimer of any intention to assert a right to the exclusive use of such land. It appears to me it would be an equally reasonable thing for a person to erect a fence across a highway, leaving a gate in the middle, and then posting a placard disclaiming any intention of obstructing the highway. His disclaimer would certainly not avail him, in view of the obvious and material fact that his fence did obstruct the highway. In my opinion, therefore, the statute is not unconstitutional, (even though some features of it may be,) since it is perfectly apparent that it is within the province of congress to make an assertion of a right to public property unlawful; and I further believe there can be no doubt but that defendant in this case has asserted a right such as is forbidden. For these reasons I must dissent from the opinion of the court.

### NOTE.

#### PUBLIC LANDS—UNLAWFUL INCLOSURES.

One who incloses public land by a fence built entirely on his own land is guilty of a violation

## United States v. Douglas-Willan Sartoris Co.

of 23 U. S. St. at Large, p. 321, forbidding the inclosure of public land. U. S. v. Buford, (Utah,) 30 Pac. Rep. 433. But such act does not apply to land granted by the organic act of Utah for school purposes after survey had been made. U. S. v. Elliott, (Utah,) 26 Pac. Rep. 1117.

Defendant may be compelled to remove obstructions erected on his own lands, on lands of the state, and on lands in which he is interested as partner or cotenant, where the other persons interested with him are not within the jurisdiction of the court, without making the latter persons parties to the action, but all persons interested in the lands who are within the court's jurisdiction, and all who own parts of the land in severalty, should be made parties. State v. Goodnight, (Tex. Sup.) 11 S. W. Rep. 119.

Defendant inclosed and occupied land on a section within the limits of a grant to a railroad, after the land had been withdrawn from sale or entry, relying on the railroad company's promise to sell the land to him as soon as it should perfect its title thereto. The railroad had not been completed when the entry was made, and the grant had not been declared forfeited. *Held*, that his was not an unlawful occupancy under 23 U. S. St. p. 321. U. S. v. Osborn, 44 Fed. Rep. 29.

Lands granted by a railroad, to which the grantee has been unable to get title, the township not being surveyed, are not within Act Cong. Feb. 25, 1885, prohibiting the fencing of "public lands of the United States," without color of title. U. S. v. Godwin, (Mont.) 16 Pac. Rep. 850.

Defendant, as licensee of the Southern Pacific Railroad Company, had inclosed certain lands of the land grant of the company. The lands had, on filing of the plat of the proposed road by the company, been withdrawn from settlement by the United States, though they had not been earned by the company. *Held*, that such inclosure of lands did not fall within those prohibited by the act of congress. U. S. v. Brandestein, 32 Fed. Rep. 738.

Defendant fenced in 160 acres of unsurveyed public lands, and filed a notice of declaration as a settler on the public domain in the office of the recorder of the county in which such lands were situate, with the view of entering them in the proper land office as soon as it could legally receive filing thereon. The act of February 25, 1885, making inclosures of public lands, without color of title, unlawful, excepts lands inclosed under an "asserted right thereto by or under claim made in good faith, with a view to the entry thereof at the proper land office." *Held*, that the inclosure was lawful. U. S. v. Godwin, (Mont.) 16 Pac. Rep. 850.

### ACTIONS.

An action for inclosing public land is one arising under the laws of the United States, within the jurisdiction of a territorial district court sitting to hear causes arising under the constitution and laws of the United States. U. S. v. Bisel, (Mont.) 19 Pac. Rep. 251, followed. U. S. v. Flaherty, Id. 553.

The act confers jurisdiction of suits brought thereunder upon the United States district or circuit court, or the territorial district court, having jurisdiction of the locality where the land is situated, to restrain violations of the act, and to compel the removal of the inclosures. U. S. v. Bisel, (Mont.) 19 Pac. Rep. 251, followed. U. S. v. Flaherty, Id. 553.

The Montana practice act, which provides for but one form of action, applies to the territorial courts, when sitting to hear causes under the federal laws, as well as when sitting as territorial courts; and a complaint praying for the removal of an inclosure of public land erected in violation of the act of congress, and for an injunction to restrain the defendant from again erecting it, is not improper. U. S. v. Bisel, (Mont.) 19 Pac. Rep. 251, followed. U. S. v. Flaherty, Id. 553.

### INDICTMENT.

An indictment for fencing public lands in violation of 23 St. U. S. p. 322, § 3, need not allege that defendant had not gone upon, improved, or occupied said lands under the land laws of the United States, claiming title thereto, in good faith, that being a matter of defense. U. S. v. Cook, 36 Fed. Rep. 896.

An indictment under such act for unlawfully inclosing a portion of the public lands must show that the defendant is not within any of the exceptions permitting such inclosure. U. S. v. Felderward, 36 Fed. Rep. 490.

### SCHOOL LANDS.

Sections 16 and 36 of each township in Montana, though by Rev. St. U. S. § 1946, reserved from the public domain, and set apart for school purposes, form part of the public lands, within 23 U. S St. at Large, 321. U. S. v. Bisel, (Mont.) 19 Pac. Rep. 251; Same v. Flaherty, Id. 553.

Act Cong. 1853, setting aside sections 16 and 36 of each township in Washington Territory for school purposes, does not sever such sections from the public domain, nor destroy their character as public lands. Barkley v. U. S., (Wash. T.) 19 Pac. Rep. 36.

### PUBLIC LANDS—CUTTING TIMBER ON.

One who enters upon public land in good faith for the purpose of securing title by pre-emption, or of claiming a homestead therein, may cut so much timber standing on the land as is necessary for cultivation, and the timber so cut he may dispose of to the best advantage possible; but he cannot go outside of his improvements to cut and sell timber, though he intend to acquire title under his claim. The Timber Cases, 11 Fed. Rep. 81; U. S. v. Lane, 19 Fed. Rep. 910; U. S. v. Williams, 18 Fed. Rep. 475. See, also, U. S. v. Smith, 11 Fed. Rep. 487. But where a settler is acting in good faith he may, for the purpose of improvement, cut timber even before he files his entry in the land office. U. S. v. Yoder, 18 Fed. Rep. 372. And where a settler on public lands has removed timber for other than the purpose of tillage, a subsequent issuance of the certificate of the register and receiver of the land office to such settler, stating that he has complied with the law in making settlement will

United States v. Douglas-Willan Sartoris Co.

relieve him from liability for such wrongful cutting. U. S. v. Ball, 31 Fed. Rep. 667. So a settler, who, pending an action for the recovery of the value of timber which he has wrongfully cut and sold to defendants, becomes entitled to the issuance of the patent to the land by the payment of the purchase money in full, thereby defeats the right of the plaintiff to recover, such action of the settler in securing an equitable title being held to relate back to the original entry. U. S. v. Stores, 14 Fed. Rep. 824.

In trover for timber alleged to have been cut on the public land, where a pre-emptor has paid for the land, the presumption is that final proof has been made, and that the final certificate has been issued, vesting him with the equitable title and leaving only the naked legal title in the United States, and precluding the latter from maintaining an action under Comp. Laws N. M. § 1882, requiring every action to be prosecuted in the name of the real party in interest. U. S. v. Saucier, (N. M.) 25 Pac. Rep. 791.

While holding land under a homestead entry, the homesteader can only cut and sell the timber from such portion or parts of the land as are being cleared for cultivation or settlement. U. S. v. Murphy, 32 Fed. Rep. 376; Same v. Mann, Id. 386.

Possession by a homestead claimant, and a receiver's receipt issued since bringing the action, do not divest the government of possession or title so that it cannot bring trespass for cutting timber on the land. U. S. v. Taylor, 35 Fed. Rep. 484.

In an action to recover penalties for cutting timber on public land, there being evidence that defendant said he owned the land, and that he was cutting timber there, and that the trees were cut on that lot, it is proper to submit the question to the jury whether defendant cut the timber himself, or whether one cutting on adjacent lands by his authority had, without his sanction, cut the timber in question. People v. Turner, (Sup.) 2 N. Y. Supp. 253.

A right of action by the United States for cutting timber less than eight inches in diameter, on public mineral lands, in violation of the regulation of the secretary of the interior, prescribed under the act of congress of June 3, 1878, which permits timber to be cut on such lands under such regulations as the secretary of the interior may make, does not fail by the subsequent repeal of the regulation, especially as Rev. St. U. S. § 13, provides that the repeal of a statute shall not release any liability incurred under it, unless the repealing act so provides. U. S. v. Williams, (Mont.) 19 Pac. Rep. 288.

A citizen of the United States and resident of Montana territory may lawfully cut and remove timber from the public mineral lands for buildings, agricultural, mining, or other domestic purposes. U. S. v. Lynde, 47 Fed. Rep. 297.

Act Cong. § 2, (13 St. U. S. 365,) granting to the Northern Pacific Railroad Company "the right, power, and authority * * * to take, from the public lands adjacent to the line of said road, material of earth, stone, timber, etc., for construction thereof," was not intended to apply only to public lands contiguous to or adjoining the line of the road, but may extend to other lands. U. S. v. Lynde, 47 Fed. Rep. 297.

Timber taken from lands adjacent to the line of the railroad may be used for construction upon any part of it. U. S. v. Lynde, 47 Fed. Rep. 297.

In an action by the United States against an executor for the value of timber cut from public land and sold by the trespasser to defendant's testator, a verdict finding that the trespasser cut the logs, and that defendant got them, without finding that the logs were cut from the land described in the petition, or from government land, or that they ever came into the possession of defendant's testator, is insufficient to sustain a judgment against defendant. Norris v. U. S., 44 Fed. Rep. 739.

Where, in an action by the United States to recover the value of logs cut on public land, the plaintiff's evidence shows that the defendant purchased from the trespasser and converted to his own use a large number of logs, among which were some of those cut from the public land, the burden is on the defendant to show that all the logs so bought by him were not so cut. Norris v. U. S., 44 Fed. Rep. 735.

### MEASURE OF DAMAGES.

In case a trespass upon public lands consisting in the wrongful cutting of timber thereon is inadvertent, the measure of damages is the value of the timber in the trees; but in case the trespass is willful, the measure of damages is the value of the property at the time the action is brought, with no deduction for the labor put forth and the expense incurred by the trespasser. U. S. v. Williams, 18 Fed. Rep. 475. And an innocent purchaser from a willful trespasser is liable for the full value of the timber at the time of the purchase. U. S. v. Heilner, 26 Fed. Rep. 80.

Where a homesteader, who has never had possession of the land included in his homestead claim, and whose entry has been canceled, buys the land from the government, such purchase does not pass title to timber which he had cut from the land before its purchase, and after he had learned that his homestead entry was invalid. U. S. v. Perkins, 44 Fed. Rep. 670.

In an action by the United States for the value of timber bought by defendant from a trespasser who had knowingly cut it from the public land, the measure of damages is the value of the timber at the time of the purchase. U. S. v. Perkins, 44 Fed. Rep. 670.

In an action of trespass by the United States for cutting timber on government land the burden of showing that the timber was cut by mistake, with a view of mitigating the damages, is upon the defendants; and, in the absence of evidence to that effect, there is no error in permitting the government to recover the value of the saw-logs when already brought to the water. U. S. v. Baxter, 46 Fed. Rep. 350.

### CRIMINAL PROSECUTION.

A criminal prosecution may be maintained for a violation of Rev. St. § 2461, making it unlawful

## United States v. Douglas-Willan Sartoris Co.

to cut or wantonly destroy any timber on any lands of the United States reserved or purchased for use in supplying timber for the navy; or to remove such timber from such lands; or to cut or remove any timber from any other lands of the United States, with intent to export, dispose of, or use the same for any other purpose than the use of the navy; and providing fine and imprisonment as the penalty for a violation of the section. U. S. v. Stone, 49 Fed. Rep. 848.

It is no defense to a prosecution for unlawful cutting of timber from public land that there was no criminal intent in the cutting. U. S. v. Murphy, 32 Fed. Rep. 376; Same v. Mann, Id. 386. See, also, U. S. v. Ball, 31 Fed. Rep. 667, 670; U. S. v. Freyberg, 32 Fed. Rep. 195.

A party prosecuted for cutting timber on the public lands under Rev. St. U. S. § 2461, is only relieved from the criminal prosecution and liabilities provided for in said section by payment of $2.50 per acre for the land on which it is cut, in pursuance of the provisions of the act of congress of 1878, (1 Supp. Rev. St. p. 329, § 5.) He is not relieved from his civil common-law liability to the United States as owner of the land for the value of the timber cut. U. S. v. Scott, 39 Fed. Rep. 900.

### CUTTING TIMBER ON INDIAN RESERVATIONS.

Rev. St. U. S. § 5388, as amended June 4, 1888, which forbids the cutting or wanton destruction of timber upon military or Indian reservations, does not apply to one who removes and uses for building purposes timber which has been cut on an Indian reservation by another person without his aid or encouragement. U. S. v. Konkapot, 43 Fed. Rep. 64.

Rev. St. U. S. § 2461, which forbids the cutting of timber growing on land of the United States which has been reserved or purchased for supplying timber for the navy, and the cutting or removal of timber from any other land of the United States with intent to export or dispose of the same otherwise than for the use of the navy, does not apply to Indian reservations in Wisconsin. U. S. v. Konkapot, 43 Fed. Rep. 64.

### BOXING PINE.

Boxing pine trees for turpentine, by which the trees are not felled nor severed from the soil, is not a cutting of timber with intent to dispose of the same in a manner other than for the use of the navy, within the meaning of Rev. St. U. S. § 2461, where the trees so boxed are not upon public lands reserved for supplying timber for the navy, and where there is no intent to export, dispose of, or use the trees or timber. Leatherbury v. U. S., 32 Fed. Rep. 780.

The last clause of section 2461, Rev. St. U. S., forbids the cutting or removal of timber from lands open to private entry with the intent to use it for any other than United States naval purposes. *Held*, that an information for unlawfully cutting timber must allege such intent. U. S. v. Garretson, 42 Fed. Rep. 22.

Rev. St. U. S. § 5388, making the wanton destruction of timber on lands reserved for public uses a crime, does not cover turpentine boxing or wanton destruction of timber on lands open for pre-emption, homestead, and cash entries. U. S. v. Garretson, 42 Fed. Rep. 22.