### K. I. MATHEWS *vs.* GREAT NORTHERN RAILWAY COMPANY.

Opinion Filed November 3rd, 1897.

**Fire Set by Locomotive—Prima Facie Negligence.**

> The rule that negligence is presumed from the mere fact that an engine set out a fire is a rule of evidence, and is therefore unaffected by the allegations of the complaint. If the plaintiff narrows his avertment to a charge of negligence in the operation of the engine, he can still make out a prima facie case by showing that the engine did in fact set the fire. But, so long as the pleading remains unamended, the plaintiff can recover only for the negligence specified; and the defendant is not required to rebut any other presumption of negligence, as it would be under a complaint charging negligence generally.

**Ownership of Property Destroyed.**

> To entitle one to recover damages for the destruction of property by fire, he must be the owner thereof. Mere possession, such as would support an action for trespass *de bonis asportatis;* will not suffice.

**Ownership of Hay Cut on Public Land.**

> There is an implied license to the public to go upon the unappropriated public lands of the United States, and pasture stock thereon, and cut the native grasses therefrom, for the purpose of making hay. One who has cut hay from such land is the owner thereof, and therefore may sue for destruction by fire negligently set out by another.

Appeal from District Court, Williams County; *Morgan*, J.

N. D. R.—6

Action by K. I. Mathews against the Great Northern Railway Company for damages for the destruction of hay and grass by fire negligently set out by defendant. From a judgment on a verdict directed for defendant, plaintiff appeals.

Reversed.

*N. A. Stewart* and *J. H. Bosard*, for appellant.

*W. E. Dodge*, for respondent.

CORLISS, C. J.   The appeal in this case is taken from a judgment based upon a verdict in favor of the defendant, directed by the court.   The action was to recover damages for the destruction of hay and standing grass, by fire, alleged to have been negligently set out by the defendant.   In his complaint the plaintiff did not charge that the engine was lacking in proper appliances, or was out of repair, but averred that the carelessness which caused the fire was that of the servants and employes of the defendant in the operation of the train.   The only evidence of negligence was the arbitrary presumption thereof from the mere fact that the defendant's engine started the fire.   This, however, was not overthrown by any countervailing proof, the defendant not offering any testimony on this point.   That a *prima facie* case of negligence would have been made out had the allegations in the complaint been as broad as the presumption is undisputed. But it is contended that the presumption of negligence, whether resting upon the decisions of· the courts or express statutory enactment, does not arise in a case in which the plaintiff has so narrowed his charge of carelessness as to exclude one or more grounds of liability.   Counsel's argument on this point was ingenious, but it has not convinced us.   This rule, which casts upon the defendant in cases of this kind the burden of disproving every conceivable form of negligence where the setting out of a fire by the defendant is proved, is a rule of evidence having no connection with any question of pleading. Under a complaint sufficiently broad, counsel for defendant must concede that a verdict which found specifically that the defendant's employes were guilty of negligence in operating the engine

would be supported by the evidence, although the case disclosed no other proof of negligence than the mere fact that the engine started the fire, there being no rebutting evidence in the case. In other words, proof that the defendant set out the fire is sufficient evidence that the engine was negligently handled. If not, then it is not evidence of any carelessness whatever. If it is not evidence of negligence in any one respect, how can a verdict rest upon it at all? Counsel's argument strikes a blow at the very existence of the rule that a *prima facie* case is made out when the fact that the defendant is responsible for the fire is shown. If the plaintiff is willing to take the risks incident to limiting his charge of negligence to one particular, the defendant cannot complain, for it is thereby relieved of the burden of disproving any negligence save that set forth in the pleading. The attitude of the plaintiff on the trial is that the setting out of the fire is evidence, not of every species of negligence, but of the particular carelessness stated in the complaint. Whether such fact is *prima facie* evidence of the particular form of negligence specified in the complaint does not depend upon any rule of pleading, is not governed by the scope of the averments of the complaint, but is determined by one general rule of evidence, which applies in all cases alike, whatever the allegations of that pleading are; *i. e.* the rule that the jury may infer negligence in any particular in which negligence is possible from the bare fact that the defendant caused the fire. The plaintiff having established a *prima facie* case that the engine was negligently operated, it is unnecessary for us to follow counsel for defendant in his argument that the fire did not start upon defendant's right of way.

We now come to the merits. It is urged that plaintiff has failed to establish his right to recover the value of the hay and standing grass burned, even conceding the negligence of the defendant. Defendant attacks the plaintiff's title to this property. We are clear that it may do so. Had plaintiff, as a naked trespasser, cut this hay on private property not owned by him, and not in his possession, his actual possession of such hay, while

sufficient to support an action of replevin in the *cepit* or an action for trespass *de bonis asportatis*, would not entitle him to sue in an action on the case one who had destroyed the property while still in his possession. The injury in such a case is suffered by the real owner, and not by the one who has possession without right as against such real owner. A thief in possession may maintain conversion or replevin against one who, without any right to possession, wrests the property from such thief. But, when the property itself is destroyed by the wrongful act of another, the wrongdoer is allowed to interpose the defense that the plaintiff has no title in order to protect himself against double liability, the right to institute the action for damages in such a case being vested by the law in the real owner of the property, and not in the one who without shadow of right is in the possession thereof. These principles are elementary, although courts, from failure to discriminate, have sometimes departed from them, as in *Railroad Co.* v. *Lewis*, 2 C. C. A. 446, 51 Fed. 658. The law on this subject is stated with great clearness and force by Mr. Justice Peckham in *Railroad Co.* v. *Lewis*, 162 U. S. 366, 16 Sup. Ct. 831.

We must therefore inquire whether the plaintiff was a trespasser, as in the Lewis case, or whether he cut the native grasses of the prairie under an implied license from the government of the United States, the owner of the land from which it was cut. It is true that it is here urged that there is no evidence that that land was in fact government land, but we are of the opinion that there was some evidence tending to prove that plaintiff had, in accordance with a custom of long standing, established a ranch upon the unsurveyed public domain, and was in such possession thereof at the time this hay was severed from the ground as is usual in such a case. It is possible that we might rest our decision that he was the owner of the hay, and therefore entitled to recover its value if defendant negligently destroyed it, upon the fact that he was in possession of the land from which it was cut. But we think that our decision should be placed on a broader

ground.   We take judicial notice of the fact that the uniform
course of the government of the United States with respect to the
use of the unsurveyed public lands by stockraisers has been such
as to constitute an implied license to all persons to go thereon
with their horses, cattle and sheep, and use them for purposes of
pasture and as hay lands from which to cut the native grasses
necessary to feed their stock during the months of the more or
less severe and protracted winters of the northern latitudes.   For
decades after the Louisiana purchase, the annexation of Texas,
the cession of California and New Mexico, and the settlement of
the Oregon controversy, there sprang up, flourished, and decayed
each season a luxuriant vegetation on wild prairies, along thou-
sands of valleys, and upon unnumbered hillsides, embracing an
area of tens of thousands of square miles.   These nutritious
grasses were for many years lost as a source of national wealth,
for they were far beyond the outposts of civilization.   And, even
after the settlement of this vast region of country had commenced,
there were destined to be millions of acres which for half a cen-
tury or more would remain as formerly—unappropriated public
domain.   What was to be the true policy of the federal govern-
ment with respect to the use of such lands and the incalculable
wealth of their natural products?   A statesman who should ex-
press in poetic form his regret that national resources of such
magnitude should be each year lost might well speak of this wasted
wealth in language in which, in another age and another clime,
the vegetation of another unpeopled region was described—a
vegetation "wherewith the reaper filleth not his hands, neither he
that bindeth up the sheaves his bosom."   To forbid—to discourage
—the use of these wide areas for the purpose of feeding stock
until such time in the distant future as should find them in the
hands of private owners would have been imbecility.   Not to
have encouraged their use for this purpose would have been to
display an utter incapacity for large and liberal views, an indiffer-
ence to the true interests of the people, and an inexplicable
blindness to the laws which regulate the growth of national

wealth and greatness. With meat commanding an exceptionally high price in the markets of Europe because of the density of population rendering land there too valuable to be used for pasturing stock on a large scale, what could ever excuse the folly of shutting out our almost unlimited public domain from use for purposes of grazing, because the government, as a distinct entity, was not to profit thereby? The people are the nation, and whatever augments their prosperity increases the national greatness and strength.

Unlike the deforesting of large tracks, taking from the land its value, and seriously affecting the rainfall and the water courses of wide areas, the use of the native grasses works no appreciable diminution in the value of the land for the purpose to which it is adapted, and no general injury whatsoever. For the government, under such circumstances, to prohibit others from obtaining the benefit of that which it can not use itself, would make it a veritable dog in the manger. But when it is considered that no special injury would result to it, as the owner of the fee, from allowing cattle to range over its prairies and through its valleys, and that, on the other hand, a great fountain of wealth would thus be opened up to its own citizens, which must else remain sealed for decades to come, it is unthinkable that it should ever be or ever have been the policy of the government to treat as a trespass the pasturing of stock upon the public lands, and the cutting of hay therefrom. We might, placing ourselves at the threshold of this century, know, *a priori*, what course the government would pursue with respect to these lands; and that policy we could then predict we know has in fact been followed without deviation or shadow of turning from the earliest times to the present day. Even with regard to timber on public lands the governmental policy has been liberal. All the mineral wealth of its great mountain ranges has been free to individual quest. And, by the acquiescence of all branches of the government for nearly a century, the public domain has been thrown open to all its citizens alike, as land which they might use, until otherwise appropriated, for the pur-

pose of feeding their stock, whether by ranging over it with their herds, or severing the grasses therefrom to make hay for their winter supplies. Congress, with full knowledge that its citizens have for many years used the public lands as ranges for stock, and that this has been done upon a large scale, has enacted no legislation to prohibit such use. And yet, at the same time, it has regulated the cutting of timber upon the unappropriated lands of the government, making it a criminal offense except under special circumstances. What inference can be deduced from this silence of congress save that of actual consent that that. practice, which was of great benefit to the citizen, and could work no injury to the government, should be suffered to continue. That department of the government which is charged with the control of the public lands has never adopted any regulations hostile to this notorious practice of owners of stock in using the public domain as pasture and hay lands; and the federal judiciary has set the seal of its approval upon this known usage, declaring that those who follow it are not trespassers, but are acting under the implied invitation of the owner of the soil. In *Buford* v. *Houtz*, 133 U. S. 320, 10 Sup. Ct. 305, Mr. Justice Miller, speaking for the whole bench, said: "We are of the opinion that there is an implied license, growing out of the custom of nearly a hundred years, that the public lands of the United States, especially those in which the native grasses are adapted to the growth and fattening of domestic animals, shall be free to the people who seek to use them, where they are left open and uninclosed, and no act of government forbids their use. For very many years past, a very large proportion of the beef which has been used by the people of the United States is the meat of cattle thus raised upon the public lands, without charge, without let or hindrance or obstruction. The government of the United States, in all its branches, has known of this use, has never forbidden it, nor taken any steps to arrest it. No doubt, it may be safely stated that this has been done with the consent of all branches of the government, and as we shall attempt to show, with its direct encouragement."

We hold that the plaintiff was the owner of the hay, even as against the United States, and could defend an action of replevin brought against it by the government. It follows that he can recover the value thereof, providing it was negligently destroyed by the defendant. The judgment of the District Court is reversed, and a new trial ordered. All concur.