J. A. TEST, APPELLANT, V. JACK REICHERT, APPELLEE.

14 N. W. 2d 853

FILED JUNE 9, 1944. No. 31788.

F. J. Reed, for appellant.

Mothersead & Wright, contra.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

PAINE, J.

In a law action for the value of wheat wrongfully appropriated, the court instructed a verdict for defendant, and plaintiff appeals.

Petition was filed November 3, 1943, alleging that plaintiff, J. A. Test, was during the month of July, 1943, the owner of approximately ten acres of growing wheat located on the southeast quarter of the northwest quarter of section 27, township 22, range 58, Scotts Bluff county; that said wheat was a good stand, a good quality, and well matured, and produced 30 bushels of wheat per acre; that during the last week of July, 1943, the defendant, Jack Reichert, wrongfully and unlawfully cut, harvested, hauled off, and appropriated to his own use all of the aforesaid ten acres of wheat, and has ever since retained possession of said grain and wheat straw; that said wheat wrongfully appropriated by defendant was reasonably worth the sum of $357 and the wheat straw so appropriated was worth $25, and that there is due and owing from defendant to plaintiff the sum of $382, for which sum plaintiff prays judgment against defendant.

On November 24, 1943, defendant filed answer to plaintiff's petition, denying each and every allegation therein contained, and praying that said action be dismissed.

On December 8, 1943, the jury having been duly selected, the plaintiff introduced his evidence and rested. Whereupon defendant moved the court to direct a verdict for the defendant. At 1:30 p. m., same day, motion was argued and submitted, and the court thereupon sustained the motion and directed a verdict. Whereupon, the following verdict was returned into court:

"We, the Jury duly impanelled and sworn in the above entitled cause do find for the defendant.

"Dated this 8th day of December, 1943.

"Mrs. May Hawley
"Foreman."

The motion for a new trial was overruled January 5, 1944.

The plaintiff sets up his assignment of errors as follows:

The court erred in withdrawing this case from the jury and sustaining the defendant's motion for a directed verdict in favor of the defendant, and in overruling plaintiff's motion for a new trial. Plaintiff also charges error in sustaining the defendant's objection to question No. 7, and to the offer of exhibits Nos. 3, 4, 5 and 6.

The evidence disclosed that plaintiff had negotiated the sale of 160 acres of land about five miles south of Lyman in Scotts Bluff county, belonging to his wife, whom he had married six or eight months before, and which land was in section 27, township 22 north, range 58, to the defendant early in May, 1943, and gave possession of the crops on the place. There were no improvements on the land.

However, in planting wheat in February, 1943, on the place he had sold, plaintiff had planted over ten acres of wheat on government land adjoining the place, and land which by the contour was easily farmed in connection with the 160 acres, but no public road led to this ten-acre tract, which could be easily reached by going across the land sold to defendant, and this ten acres had been farmed the year before by Guy Cavett, the tenant of plaintiff's wife, in connection with her 160 acres of land, but he was leaving the place, so the plaintiff and a man hired by him went on and planted the wheat. After plaintiff planted this wheat in February, he was over there looking after the crop several times.

When plaintiff and defendant were negotiating for the sale of the 160 acres in May, 1943, the defendant asked about the wheat on the government land adjoining, and plaintiff said he would sell him this ten acres of wheat for $50, and defendant answered, "No, I don't want it." "Q. What further, if anything, was said about it? A. Nothing more was said about it only I just laughed, well, I said, 'You say it ain't worth it.' I said, 'I will cut three hundred bushels off of that little patch.' He just laughed and that was about the extent of the conversation. * * * Q. Was there anything said between you and Mr. Reichert about your having the right to come across his place to harvest your

place? A. I said, 'Well, if you don't want to buy it, I want to reserve the right to go in and get that wheat.' Q. What did Mr. Reichert say? A. 'Okeh.' "

The evidence discloses that one Saturday night in July, between 6 and 7 o'clock, the plaintiff, who was living on the place across the road, and was out irrigating his alfalfa, noticed that defendant and his hired man, Russell Janis, had started cutting his wheat on this ten-acre tract, and he went right over, and he was asked to tell what happened. "A. I drove over there and turned around and drove back to the end, Mr. Reichert drove up with his tractor, and I said, 'Hello, Jack.' He spoke. I said, 'Why didn't you let me know you were going to harvest my wheat?' He said, 'Your wheat?' He said, 'You ain't got no wheat over here.' I said, 'Jack, I offered to sell you this wheat and you refused to buy it.' And he said, 'Hell, everybody in the country knows I farm this place, and this place belongs to this place.' I said 'You remember I offered to sell you this wheat for $50.00?' And he said, 'Yeah; it wasn't worth it then.' Q. Was Mr. Janes present when you were having this conversation? A. Yeah, he was a short distance away—not too far. Q. What further, if anything, was said by Reichert? A. He just said, 'You are just snooping in too much about me and about my business.' And he said, 'You are going to get hell knocked out of you.' And I said, 'By who?' And he patted himself on the chest and said 'Who?' And he said, 'By me.' And I said, 'I wouldn't do that, if I were you, Jack, it might not turn out right.' He said, 'Get the hell out of here and stay out of my place.' I said, 'Okeh.' Q. Did he continue on to cut the wheat? A. He continued on to cut the wheat."

Plaintiff testified that three or four days before he had gone over and looked at this wheat of his, and made arrangements to get the wheat cut. He testified that he had raised wheat since 1917, and that in his opinion the wheat would make 28 to 30 bushels to the acre, and described how he accurately measured the field of wheat and it had an area of 11 acres less one-tenth of an acre, and gave the exact dimensions in feet.

From this brief statement of the evidence, it can be seen that the plaintiff went upon this ten-acre tract and peaceably planted this crop of wheat. He offered to sell it to the defendant when he bought the adjoining land, and upon defendant's refusal to buy this growing wheat for the price offered of $50, the plaintiff reserved the right to go over the land he was selling for the purpose of harvesting this wheat.

The defendant calls our attention to a United States statute, 43 U. S.C. A. 302, sec. 1061, which is entitled "Inclosure of or assertion of right to public lands without title" and defendant insists that under this statute plaintiff's assertion of a right to the exclusive use of the land on which he had planted his wheat was unlawful. This act was passed by Congress on February 25, 1885, and was doubtless designed for the purpose of making it illegal for the cattlemen to fence in vast tracts of government land. Under the annotations to this section, we find that in 1889 this act came before the Wyoming court, which placed a limitation upon this section, which may be briefly stated as follows: It has been said that two things are forbidden by this act, (1) the enclosure, and (2) the assertion of a right to the exclusive use of public lands without right or color of title. "The actual use, as distinguished from the assertion of the right to use, is not forbidden." It has been held that the only judgment which can under this act be rendered in a civil suit is for the destruction of the fence and an injunction against its rebuilding. *United States v. Douglas-Willan Sartoris Co.*, 3 Wyo. 287, 22 Pac. 92.

In *Tarpey v. Madsen*, 178 U. S. 215, 20 S. Ct. 849, Mr. Justice Brewer said: "It must be remembered that mere occupation of the public lands gives no right as against the government. It is a matter of common knowledge that many go on to the public domain, build cabins and establish themselves, temporarily at least, as occupants, * * *. These occupants are not in the eye of the law considered as technically trespassers. No individual can interfere with their occupation, or compel them to leave. Their possessory

rights are recognized as of value and made the subjects of barter and sale."

From these authorities it appears that one may go on open public lands and establish himself there temporarily, but not enclose such lands with a fence, and is not considered as technically a trespasser. No individual can interfere with such occupation, and any rights growing out of such possession may be sold.

It is the law that "one may acquire rights in public lands by adverse occupancy against all third persons, and this is true even though the claimant admits the government's ownership; in other words, the claimant's possession may be adverse without being hostile to the government." 1 Am. Jur. 848, sec. 104.

While it is true that the title of the United States to public land carries with it everything growing on the land, and a trespasser on public lands does not acquire title against the government as to crops grown by him on such lands, yet as between two trespassers the one who sowed the seed would have the title.

"The title of the United States to public land carries with it everything growing on such land, and as against the United States a trespasser on public lands does not acquire title to crops grown by him on such lands; but as between two claimants of a crop, it has been held that the one in possession of the public land and who sowed the seed has title, and that one in possession in good faith endeavoring to perfect his title, is entitled to crops sown and harvested by him during his possession, as against another who is finally adjudged the owner by virtue of an entry made by himself." 50 C. J. 907.

In *Buford v. Houtz,* 133 U. S. 320, 10 S. Ct. 305, it is said: "We are of the opinion that there is an implied license, growing out of a custom of nearly a hundred years, that the public lands of the United States, especially those in which the native grasses are adapted to the growth and fattening of domestic animals, shall be free to the people who seek to use them where they are left open and unenclosed, and no act of government forbids this use."

"There is an implied license to the public to go upon the unappropriated public lands of the United States, and pasture stock thereon, and cut the native grasses therefrom, for the purpose of making hay. One who has cut hay from such land is the owner thereof, and therefore may sue for destruction by fire negligently set out by another." *Mathews v. Great Northern Ry. Co.*, 7 N. Dak. 81, 72 N. W. 1085. See, also, 50 C. J. 906.

The right to a crop of wheat which is growing on public land is in the one who has planted it and looked after it, rather than in one who forcibly takes possession thereof against the will of the planter.

In our opinion, the trial court was in error in instructing a verdict for defendant. As the case will again be tried to a jury, the other assignments of error about errors as to rulings upon the oral evidence and admission of exhibits may not occur in the next trial. The verdict is set aside and the cause reversed.

REVERSED.