## TYTLER v. TYTLER.

HABEAS CORPUS—JURISDICTION—DISTRICT JUDGES—CUSTODY OF MINOR CHILDREN—QUESTION INVOLVED—LAW OF FORUM CONTROLS—EVIDENCE—PREFERENCE OF CHILD.

1. Under the constitution the jurisdiction of a District Judge in habeas corpus is an unqualified one, and as broad in its scope as that of a court in such proceeding.

2. Habeas corpus is a proper proceeding to determine the right to the custody of minor children between contesting claimants.

3. On habeas corpus to determine the custody of a minor child the question of personal freedom is not involved, but the case is to be determined in view of the best interests of the child, whose welfare requires that it be in the custody of someone.

4. In a controversy between parents for the custody of their minor children the court will regard the welfare of the children as the paramount consideration, though the statute provides that the father, if living, or, if he be deceased, the mother, being themselves competent to transact their own business and not otherwise unsuitable, must be entitled to the guardianship of the minor.

5. Upon the separation of the parents the joint right to the custody of their minor children is severed, and it may then go to one or the other.

6. The law of the forum controls in determining the custody of minor children as between contesting parents, regardless of the law of the domicile of the parties.

7. On error in a habeas corpus proceeding for the custody of minor children, the case is not for trial *de novo,* but the record will be examined to ascertain only whether it discloses an abuse of the discretion of the trial judge in awarding the custody of the children to one of the contestants.

8. The non-performance of the marital duty of a husband or wife to live with the other should be founded upon some good substantial reason to justify the awarding of the custody of the minor children of the marriage to the deserting parent.

9. Where a wife separates from her husband because of her physical ailments and a condition rendering a continuance of the marital relation extremely dangerous to her health,

her duty is not so violated as to require her deprivation of the custody of their minor children, where she is not otherwise unfitted for such custody.

10. Where the parents of minor children were not living together, the fact that on the occasion of a visit to the children in another country at the home of the father with whom they had remained after the separation, the mother, without the father's consent or immediate knowledge, but peaceably, took the children away with her and brought them to her home in this state, does not require a return of the children to the custody of the father, or show the mother to be unsuited for such custody, it appearing that the latter's said conduct occurred through love for the children and a desire to better their condition.

11. In a controversy between parents over the custody of their minor children, one being a girl nearly fourteen years old and the other a boy nearly six years old, an expressed preference of the girl to live with the mother, in whose custody she is, for substantial reasons stated by her when being examined as a witness upon a trial of the proceeding, is proper to be considered in connection with the other evidence.

12. The weight to be given an expressed preference by a minor child as to custody is not dependent upon the child's age, but more upon the intelligence of the child and the reasonableness of the preference.

13. The custody of a girl nearly fourteen years old at the time of trial and over that age at the time of hearing the appellate proceeding, and a boy about six years old, being involved in a contest between the parents, neither of whom is shown to be personally unsuitable, the expressed preference of the girl, appearing to be unusually intelligent, to live with her mother, and the desirability of keeping the brother and sister together under a mother's care, held to require, in the interest of the children, that the mother be permitted to retain their custody; and that a decision to the contrary by the court below was an abuse of discretion justifying a reversal.

[Decided March 19, 1907.]                    (89 Pac., 1.)

ERROR to the District Court, Sweetwater County, HON. DAVID H. CRAIG, Judge.

Habeas corpus, for the custody of minor children. The case and material facts are stated in the opinion.

*D. A. Reavill* and *N. E. Corthell,* for plaintiff in error.

An affidavit of a witness taken without notice to the opposite party is not admissible on a hearing in habeas corpus. (Rev. Stat. 1899, Secs. 5496, 3705.) Whenever the application is sought of the rule that error not prejudicial will not cause a reversal, the absence of prejudice must clearly appear, so as to show beyond doubt that the error could not have been prejudicial. (Deery v. Cray, 5 Wall., 795; Smith v. Shoemaker, 17 Wall., 630; Moores v. Nat. Bk., 104 U. S., 625; Gilmer v. Higley, 110 U. S., 47; R. R. v. O'Brien, 119 U. S., 99; Mexia v. Oliver, 148 U. S., 665; R. R. Co. v. O'Reilly, 158 U. S., 334; Lucas v. Brooks, 85 U. S., 436; Masonic Assn. v. Schryock, 73 Fed., 774; U. S. v. Gentry, 119 Fed., 70-75; R. R. Co. v. Field, 137 Fed., 14; Biscuit Co. v. Nolan, 138 Fed., 6; Terry v. Starch Co., 43 Neb., 866; Winkler v. Foye, 33 N. H., 171; Hoberg v. State, 3 Minn., 262; Myers v. Malcolm, 6 O., 292; Clark v. Vorce, 19 Wend., 232; Bank v. Winfield, 24 Wend., 219; R. R. Co. v. Gregg, 67 N. H., 452.) It does not matter that the case was heard before a judge and not before a jury, and it cannot be assumed that the judge regarded only the legal evidence and disregarded that which was illegal and incompetent. (Est. of James, 124 Cal., 653; Bough v. Geiselman (Tex.), 55 S. W., 615; Carroll v. Deimel, 95 N. Y., 252; Gordon v. McCall (Tex.), 48 S. W., 1111; Brigham v. Gott, 3 N. Y. S., 518; Bank Note Co. v. Ry. Co., N. Y. S., 532; Sparagel v. Delinger, 36 Cal., 278; Torance v. Bank (Kan.), 71 Pac., 235.)

A very considerable portion of the evidence was taken up with the difference between the husband and wife and the causes which led to their separation. Such evidence is only important to explain the situation of the parties; their mutual relations; and the condition in which they were found. It might be said that what happened ought to have been foreseen by the relator, when at the age of forty-one years, a traveled, experienced, mature man of the world

married a girl of eighteen on a very short acquaintance. The incompatible ages, training, experience and tempers of two such persons foretold the trouble, narrated in the wife's testimony as to her husband's conduct, which she at least considered slighting, terrifying, cruel and intolerable. If her testimony is true, it is easy to understand how the wife should have been worried to the verge of insanity, and that the children might possibly have been affected in the same way; and the hopelessness of their domestic situation is made evident when the relator, recalling the experiences of their married life, is presuaded that he at least has made no mistakes, and that if he had his life to live over again he cannot see how he could alter his conduct for the better. But this proceeding is no place for crimination or recrimination nor for the settlement of marital disputes. This case concerns itself only with the question of the welfare of the children, so far as that question may be considered in habeas corpus.

The evidence in that respect, considering the health and education of the children and the necessity for a mother's care, clearly shows that their welfare requires the custody of the mother. It is manifest that the choice of the older child, Muriel, is a wise one. Where, in a case of this character, the interest of a parent is considered, it is regarded in the light of a duty or trust rather than a power or privilege. Again, we have in view the growing equality between the status of wife and husband in relation to their civil rights. (Nugent v. Powell, 4 Wyo., 173; Church Hab. Corp., 441-443; Jones v. Bowman, 13 Wyo., 79; Sturtevant v. State, 15 Neb., 463; Giles v. Giles, 30 Neb., 627; Jones v. Darnall, 103 Ind., 573; Foster v. Alston, 6 How. (Miss.), 406; State v. Baird, 18 N. J. Eq., 194; *Ex parte* Schumbert, 6 Rich., 334; Matter of Wallenstonecraft, 4 Johns. Ch., 80; Matter of Waldron, 13 id., 418; Matter of McDowle, 8 Johns., 328; Mercein v. People, 25 Wend., 63; *In re* Barry, 42 Fed., 113; U. S. v. Greene, 26 Fed. Cas. No. 15256; Corrie v. Corrie, 4 N. W., 213 (Mich.);

*In re* Bort, 25 Kan., 308.) These cases sustain the theory that in freeing the infant from an improper restraint, the court is not bound to deliver him to any particular person; his welfare is the paramount consideration.

Whether the court will regard the child's preference depends upon the reasonableness thereof, and the intelligence manifested—mental capacity and not age being the criterion. (15 Ency. L., 186; Hurd on Hab. Corp., 532; Chunn v. Graham, 43 S. E., 987 (Ga.) If the child be of sufficient age and discretion he may, upon release from the complained of custody, be permitted to go where he chooses. (Rex v. Deleval, 3 Burr., 1434; Rex v. Clarkson, 1 Strange, 444; Rex v. Smith, 2 id., 982.) The application of the rule as to preference is illustrated in the following cases in addition to the above. (*In re* Poole, 29 Am., 628; Curtis v. Curtis, 5 Gray, 535; Com. v. Hamilton, 6 Mass., 272; Neville v. Read (Ala.), 32 So., 659; People v. Chegary, 18 Wend., 637.) And the children of one family should be kept together if practicable. (Jones v. Bowman, 13 Wyo., 92.) Here, the tender age of the boy renders him peculiarly proper for a mother's care.

*John W. Lacey,* for defendant in error.

Proceedings in habeas corpus, especially where the custody of infants is involved, are summary in character, and great discretion is given to and exercised by courts and judges in such proceedings. (Church on Hab. Corp., Sec. 177.) The court has power upon this process to inquire fully into the matter, and is not restricted to ordinary modes of trial, but may direct that the children be brought before him, and may examine them privately, and may also avail himself of affidavits or other reasonable and proper sources of evidence. (Dumain v. Gwynne, 92 Mass., 270; Corrie v. Corrie, 42 Mich., 509; Versen v. Ford, 37 Ark., 27; R. S. 1899, Sec. 5496.) Affidavits were admissible in such cases before made so by any statute; so that the statute is merely declaratory of the rule already existing, and does not seek

to enlarge or abridge it. (Rex v. Delaval, 3 Burr., 1434; State v. Lyon, 1 N. J. L., 462; 1 Tidd's Pr., 347; *In re* Ballman et al., 4 Cranch, 75; 1 Burr's Tr., 21.) Hearsay testimony has often been used in such cases. The admission of the affidavits complained of was not prejudicial even if erroneous, since the same facts therein stated were shown by other abundant and uncontradicted testimony. (Hanf. v. Asso'n., 76 Wis., 450; La Duke v. Exeter, 97 Mich., 450; Tollman v. Bowerman, 4 S. D., 197; Ry. Co. v. Tabor, 98 Ky., 503; Ward v. Ry.. Co., 97 Ia., 50; N. Y. v. Bank, 126 N. Y., 685; Ry. Co. v. Anderson, 26 Fla., 425; Larson v. Inv. Co., 51 Minn., 141; Galoin v. Palmer, 113 Cal., 46; Silvarer v. Hansen, 77 Cal., 579; Webb v. Barling, 56 Fed., 203; Greer v. Laws, 56 Ark., 37; White v. Spreckels, 75 Cal., 610; Rix v. Horstmann, 93 Cal., 502; Wilson v. Coleman, 81 Ga., 297; Powell v. Brunner, 86 Ga,. 531; People v. Madison Co., 125 Ill., 9; McKay v. Riley, 135 Ill., 586; Sunnyside Co. v. Reitz (Ind.), 43 N. E., 46; Darnall v. Bennett, 98 Iowa, 410; Turnbull v. Maddux, 68 Md., 579; Tel. Co. v. Littlejohn, 72 Miss., 1025; Foster v. Ry. Co., 115 Mo., 165; Johnson v. Colton, 127 Mo., 473; Black v. Hill, 32 O. St., 313; Ball v. Stewart, 41 W. Va., 654; Milliken v. Maund, 110 Ala., 332.)

We are ready to admit the general statement that the best interests of the children is the question of paramount importance in such proceedings. It is not the only question. The law looks at rights somewhat in all habeas corpus proceedings, but chiefly to the interests of the child where those interests can be advanced without wrong. But what indication is there in the record here that the court below failed to recognize this principle? We insist that a just consideration of the interests of the children would require the judgment and order entered below, and would not permit any other order. Here Mrs. Tytler is not shown to be able to earn anything whatever. She is living with relatives, but how long that may continue cannot be known. If the children are left with her, so far as is here shown,

they will be obliged to depend upon the charity of some relative, which may or may not be given, and failing which they would be utterly without means of support. More than that, as we have seen, Mrs. Tytler has been recreant to her duty. She has failed in those things which wives and mothers· deem the most sacred obligations. What security is there in the whim of such a mother for the future of the children as compared with the security in the affection of this father, who has made good his promise; who has stood by his family; who has over and over again entreated his recreant wife to return; who gave up in large measure his employment and spent the days and nights in caring for these children? Moreover, how can the court here say that the lower court was in error in concluding that the best interests of the children required their presence with their father? This court has seen no witness. The court below had before it the children, this father and mother, and all of the other witnesses.

The general rule laid down by counsel for· plaintiff in error is too narrow. The statute recognizes a right and corresponding duty on the part of the father. (R. S. 1899, Secs. 4870, 4872, 3025, 3026; Nugent v. Powell; 4 Wyo., 173.) The father is, in general, entitled to the custody of his infant child, though not absolute, but depending to some extent upon the welfare of the child. But his rights are not to be totally disregarded. (Bonney v. Bonney (Ky.), 3 S. W., 171; Lemmin v. Lorfeld (Wis.), 83 N. W., 360; Giffin v. Gascoigne, 47 Atl., 25; Dunkin v. Seifert (Ia.), 98 N. W., 559; Com. v. Briggs, 16 Pick., 203.)

The presumption is, excepting where the record clearly discloses the contrary, that the court below adopted the correct view of the law, whatever that may be. There was simply a general finding for the father based on uncontradicted evidence that he was in all respects suitable, and had carefully looked after his children, and performed a father's duties. On the other hand is a mother who for two years has wholly neglected every maternal duty. On

the father's side is capacity to earn a living for these children and the mother also. On the side of the wife is the general statement that her friends and relatives will care for her and the children. Upon these facts the court has found that the best interests of the children require that they shall be given into the custody of their father. Had the finding been the other way, there might even under the rule of law in this state have been some ground to argue that the cause should be reversed. But the decision as it stands is not so violative of discretion, is not so clearly and palpable against the great weight of the evidence, even if it may be said that there is a conflict in the evidence, as to authorize a reversal. (Edwards v. Murray, 5 Wyo., 153; Bank v. Dayton, 1 Wyo., 336; Edwards v. O'Brien, 2 Wyo., 493; O'Brien v. Foglesong, 3 Wyo., 57; Ketchum v. Davis, 3 Wyo., 164; Rainsford v. Massengale, 5 Wyo., 1; Hood v. Smiley, 5 Wyo., 70; Hester v. Smith, 5 Wyo., 291; Drug Co. v. Drug Co., 5 Wyo., 510; Jackson v. Mull, 6 Wyo., 55; Wyman v. Quayle, 9 Wyo., 326; Lonabaugh v. Morrow, 11 Wyo., 17.)

Though the wishes of the child are competent to be considered, they are not controlling. (Chunn v. Graham (Ga.), 43 S. E., 987.)

SCOTT, JUSTICE.

The defendant in error, Frederick John Tytler, plaintiff below, under the provisions of the habeas corpus act applied to the Judge of the Third Judicial District for a writ of habeas corpus to recover the custody of his two minor children, Muriel, aged thirteen and one-half years, and Eric, aged five and one-half years, from their mother, Helen Maud Tytler, defendant below. John St. A. Boyer, the brother of Helen Maud Tytler, was joined as defendant, but there was a disclaimer of any right to the possession of the children by him, a finding in his favor and a dismissal of the writ as to him. Plaintiff and defendant are husband and wife, having been married November 18, 1890. They

had separated, and were living separate and apart prior to and at the time of the institution of this proceeding, and the children are the fruit of their marriage. The writ was issued and made returnable before the Judge, and at the time and place therein mentioned the children were brought before him, the issues made up and the hearing had on January 2, 1906, and upon consideration the Judge found generally in favor of the father and awarded him the custody of the children. The papers in the case were filed with the clerk of the District Court and the order was entered upon the journal pursuant to the provisions of the statute. The mother, Helen Maud Tytler, brings the case here on error, and, having given a supersedeas bond, was permitted to retain the custody of the children with permission to the father to visit them at reasonable times pending these proceedings.

1. It is urged that the order and judgment in said cause is contrary to law. Under the provisions of the constitution the Supreme Court has original jurisdiction in such cases, and each of its Judges "has power to issue writs of habeas corpus to any part of the state upon petition by or on behalf of any person held in actual custody, and make such writs returnable before himself or before the Supreme Court, or before any District Court or any Judge thereof." (Art. V, Sec. 3.) The District Courts and their Judges "shall have power to issue * * * writs of habeas corpus on petition by or on behalf of any person in actual custody in their respective districts." (Art. V, Sec. 10.) By these provisions the jurisdiction is an unqualified one lodged in the District Judge to hear and determine questions of this nature arising within the limits of his district, and is as broad in its scope as that of a court which has the power to exercise jurisdiction in a like proceeding. (Rust v. Vanvacter, 9 W. Va., 601.) It has long been established that the right of the custody of minor children may be litigated in habeas corpus proceedings. In such cases the question of personal freedom is not involved, for an infant, from

humane and obvious reasons, is presumed to be in the custody of someone until it has attained its majority. As was said by Day, J., in New York Foundling Hospital v. Gatti (decided by U. S. Supreme Court Dec. 3, 1906) : "Such cases are not decided upon the legal right of the petitioner to be relieved from unlawful imprisonment or detention, as in the case of an adult, but upon the court's view of the best interests of those whose welfare requires that they be in custody of one person or another. In such cases the question of personal freedom is not involved except in the sense of a determination as to which custodian shall have charge of one not entitled to be freed from restraint." It is urged that this rule does not govern in the case before us by reason of the provisions of Section 4870, R. S., as amended, Ch. 84, S. L. 1901, which is as follows : "The father of the minor, if living, and in case of his decease the mother, whether remarried or not, being themselves respectively competent to transact their own business and not otherwise unsuitable, must be entitled to the guardianship of the minor." By Section 4871, R. S., it is provided : "If the minor has no father or mother living, competent to have the custody and care of his education, the guardian shall have the same." In Jones et ux. v. Bowman, 13 Wyo., 79, this court held that in habeas corpus proceedings involving the custody of an orphan child the interest of the child is the sole consideration. It is clear that in a controversy between the parents for the custody of their minor children the court will regard the welfare of the children as the paramount consideration. (22 Cyc. Tit. Custody and Protection, p. 519, and cases there cited.) . Similar statutory provisions to Sections 4870 and 4872, *supra,* have been construed by courts of different states. In Indiana the statute provided : "That the father of such minor (or if there be no father, the mother, if suitable persons respectively) shall have the custody of the person and the control of the education of such minor." The Supreme Court of that state, in construing that statute

in a like proceeding to the one before us, said: "The question of the custody of the child was one in which the rights of the child were primarily involved, and where those of his parents were of secondary consideration merely." (Joab v. Sheets, 99 Ind., 328.)    In Jones et ux. v. Darnell, 103 Ind., 569, and Sturdevant v. State ex rel., 15 Neb., 459, the facts were quite similar.  In each of those cases the father instituted proceedings in habeas corpus to recover custody of his minor child, who was of tender age and being cared for by its maternal grandparents, and in each case it was held, notwithstanding similar statutory provisions, that in such controversy the order of the court should be made with reference to the best interests of the child.  In Nugent v. Powell, 4 Wyo., 195, which involved the validity of adoption proceedings, this court said: "And hence from a careful examination of the question, we come to the conclusion that the right of a father with respect to his minor child is not an absolute paramount proprietary right or interest in or to the custody of the infant, but is in the nature of a trust reposed in him   *   *   *."   This declaration of the law respecting the nature of the right of the father to the custody of his minor child is in so far as it goes conclusive upon the courts of this state.  Upon principle and authority a court or judge having jurisdiction to inquire into a question of such vital interest ought not to be hampered with a strict construction of statutes which would be the cause of much embarrassment and often defeat the ends of justice. The right to the custody of their minor children is a joint one to be enjoyed by their parents so long as the latter live together and exercise the right.  The right of the father to the custody of his minor child is limited as stated in Nugent v. Powell, supra.  He has no legal or arbitrary right to keep such child away from its mother if the separation from her endangered its health and especially if it was of such an age as to require a mother's care.  Upon the separation of the parents the joint right of custody is severed; it must then go to the one or the other.  If the parents can-

not agree as to which shall have such custody, and resort to courts to determine that question, they must abide the law of the place where the question is litigated, regardless of the law of the domicile. (Woodworth v. Spring, 4 Allen, 321.) The inability of the parents to live together and exercise a joint custody and interest in the welfare of their children is something for which the latter are in no wise responsible, and when such inability exists the judge or court will in a proceeding of this nature designate one or the other, if suitable to perform the trust which has ceased and failed as a joint one and which should be carried on by someone. We are of the opinion that Sections 4870 and 4872, Revised Statutes, *supra,* are directory and in a case like the one before us permit of the exercise of a sound discretion in behalf of the children as to who should have their custody. In theory and in fact they are the ones whose interests are involved and the writ is primarily issued for their benefit, and the court or judge must of necessity decide the case from the standpoint of their welfare. (22 Cyc., 519, and 15 A. & E. Ency. of Law, 187.)

In the case before us the parties and their children are subjects of the King of Great Britain. The children prior to coming to Wyoming were, ever since their birth, in the joint custody of their father and mother until the parents separated, and since then, until they were taken by their mother, as hereinafter stated, they were in the custody of the father and resided with him in British Columbia. Since coming to Wyoming they have been in the custody of and residing with their mother. Such being the case, she was their protector and entitled to their custody, even as against the father, whether he resided within or without the jurisdiction, until he made it appear that a due regard for their welfare required that their custody should be taken from her. In Woodworth v. Spring, *supra,* in a controversy over the custody of a child, the Supreme Court of Massachusetts said: "He [meaning the child] is now lawfully within the territory and under the jurisdiction of this commonwealth and

has a right to claim the protection and security which our laws afford to all persons coming within its limits, irrespective of their origin or the place where they may be legally domiciled. Every sovereignty has the right of determining the status or condition of persons found within its jurisdiction. The laws of a foreign state cannot be permitted to intervene to effect the personal rights or privileges even of their own citizens while they are residing within the territory and within the jurisdiction of an independent government. * * * The question whether a person within the jurisdiction of a state can be removed therefrom depends not on the laws of the place from whence he came or in which he may have his legal domicile, but on his rights and obligations as they are fixed and determined by the laws of the state or country in which he is found. * * * The comity of a state will give no effect to foreign laws which are inconsistent with or repugnant to its own policy, or prejudicial to the rights and interests of those within its jurisdiction. Even the parental relation, which is everywhere recognized, will not be deemed to carry with it any authority or control beyond that which is conferred by the laws of the country where it is exerted."

2. It is urged that the finding, judgment and order are not sustained by sufficient evidence. The finding was a general one upon the issues and the evidence is in the record, part of which was oral. The trial judge had the benefit of having the parties and some of the witnesses before him. The case does not come before this court for trial *de novo*. In considering the evidence we do not, sitting as a court of review, assume to weigh it, but only look into the record to ascertain if the judge abused his discretion in awarding the custody of the children to their father. From the pleadings and the evidence both parents are very much attached to their children and both are anxious to do everything within their power for them. The exact cause of the separation does not clearly appear, though it may be inferred by reading between the lines. Their home was

and had' for many years been in British Columbia, and the evidence tends to show that they had lived in comparative happiness until the birth of Eric, after which the mother was in poor health as the result of improper medical attendance during confinement and the necessity for a surgical operation. Her physician recommended a complete change and rest for two years, and advised that such change and rest were absolutely necessary for her recovery. The parties were in poor circumstances financially, though he had always been able to comfortably support his family. They owned a house at Mission, B. C., where they first lived after they were married. He is a civil engineer by profession and followed that as an occupation whenever he could obtain work, which was only a part of the time. Such work was not always in the vicinity of his home and the family moved as occasion required, so it would be more convenient for them to live together. They were living at Victoria at the time they separated and soon after he moved with his children to Esquimalt, a suburb of Victoria, where they were living at the time she took the children as hereinafter stated. She went away in August, 1903, for a few weeks for the benefit of her health and returned to her home, where at the end of three weeks she was seized with acute mania, as the result of which she was placed in a hospital. Leaving the hospital in a short time, she started for Rock Springs in this state, her husband accompanying her as far as Seattle, Washington, where they had Christmas dinner, since which time they have not lived together as husband and wife. He returned to the home in British Columbia, where the children were, and she came to Rock Springs and then went east, being operated on in March, 1904. During her convalescence she visited relatives in Canada. Because of his inability to do so, her brothers paid her expenses for the operation and her traveling about. She returned to Rock Springs in this state, making her home in the family of a Mr. Kendall, whose wife is her sister, and at whose home she and the children were at the com-

mencement of these proceedings. Her health is much better since the operation and she has never had a return of acute mania. She was robust and in good health at the time of her marriage, and after the operation, during her convalescence, she in part supported herself as a nurse, but since coming to Rock Springs the support, care and maintenance of herself and the children has been and is being provided for by her brother, who is financially able and anxious to do so. During her absence and until she got possession of the children they were cared for by the father, who had no one to look out for or give them personal care and attention but himself. The housework was done by him and Muriel, and during the day time his work kept him away from the house, where they were left without a protector or anyone to care for them. He always remained home evenings, sometimes taking them out to entertainments, and in every way tried within his limited means to care for them, and showered his love and affection upon them. It is admitted in the pleadings that for two years prior to coming to Rock Springs Muriel's health was such that it was deemed inadvisable to send her to school, and it appears in the evidence that since coming to Rock Springs her health has been good and that she has been and is attending school there. While residing with her father he gave her instruction at home, but she was not as far advanced in her studies as other children of her age who had the advantage of attending school. That Eric's health was not good at Esquimalt, where the parties lived, and that he is in good health at Rock Springs. That the father wrote the mother at different times while she was away, telling of Eric's health and physical condition, which in her condition of health worried her very much. The children were not permitted to go to her, and she testifies that the physician advised her that it was necessary for her recovery to have them with her, and also that she stay away from Victoria. She says: "At Esquimalt they had no mother to look after them, no one to work for them, no education. They were running

wild there, and here they are having an education, and they have money to clothe them and feed them properly, and certainly my care and love is, of course, an advantage, and then they have the advantage of this climate and change." She has no means and the children are supported and cared for by their uncle, who is financially able and anxious to do so. Muriel said in her testimony: "When I was living with my father, I was always—a father is different to a mother, you know, he couldn't look after us like a mother can. I always needed her care. * * * Here I have no worry at all. I go to school here and I never went to school there. I love my mother as I could never love my father. That is the difference." She also testified that she and Eric loved their father all the time, but that she preferred to live with her mother; that she would like to live with her father and mother, but when they were so living her mother "was very unhappy and, of course, that made me unhappy." Late in October, 1905, the mother and her brother went from Rock Springs, Wyo., to Esquimalt, B. C., to obtain custody of the children amicably or by legal proceedings. They stopped at a hotel instead of going to the home, and on the evening of the day of her arrival the brother went to plaintiff's home and told him his wife was at the hotel and desired to see the children. Plaintiff, upon inquiry as to why she did not come home, was informed that she was too tired and desired to rest at the hotel that night, and plaintiff took the children to see their mother, at the hotel. After the children had come from her room, telling him that their mother wanted to see him, he visited her, but says he soon found that he was not welcome, and left the hotel, leaving the children to stay all night with their mother. They were brought home the next day. The children were permitted to visit their mother during the day time for about a week, after which he denied them that privilege, but permitted their mother to visit them at their home, and on such occasions he absented himself, so that they might be alone with their mother. The father testified that his reason for

not letting the children visit their mother at the hotel was that he feared she would take them away. He alleges in his petition that his wife's brother had proposed to him that he turn the custody of the children over to their mother, which proposal he declined, and that he proposed that his wife should return and live with him, or live in the vicinity, where she could be constantly near the children. He testified that she did not return to his home as his wife. The evidence tends to show that on November 10th following, in his absence, the mother and her brother went to his home and the home of his children and took them without his knowledge or consent and brought them to Rock Springs, in this state, where they have been residing with their mother ever since. The father, upon his arrival home in the evening from his work, found the children gone, and, upon inquiry, found they had gone away with their mother and uncle. The next day he received a telegram from his wife, dated at some staiton in the State of Washington, telling him not to worry, that the children were with her. Muriel says she went willingly with her mother, although she did not know, but was suspicious, that she and Eric were going away from her father to live with their mother and that she wanted to go.

It is alleged in the petition: "That the sole pretense of the said restraint, so far as your petitioner is advised and according to his best information, is the wish of the said Helen Maud Tytler to have possession of the said children; * * * that the said restraint is illegal and was originated and continued solely by the unlawful invasion of the home of your petitioner as aforesaid by the said Helen Maud Tytler and the said John St. A. Boyer, and the unlawful and forcible taking possession of the said children by the said Helen Maud Tytler and John St. A. Boyer, as aforesaid, and the unlawful and forcible and clandestine carrying away of the children by the parties last above named from the home of your petitioner to the said County of Sweetwater, in the State of Wyoming." This allegation

was met in the return and answer of the defendant and also in the evidence, and while it appeared that the defendant acted upon her desire to have the children with her, it is not the sole reason; it was that in connection with a desire to release them from the condition in which they were living. To relieve their condition she should, if her health permitted, have shared the home with her husband and children. It is, of course, the marital duty of a wife to live with her husband, having taken upon herself the responsibility to so conduct herself toward him, and his duty to her is the same, so that their children may have the benefit of the joint care and affection of both father and mother. This duty is a most sacred one and its non-performance ought not to be easily excused, but should be for some good, substantial reason to warrant the court in giving the custody of minor children to the parent who is guilty of violating such duty. Such duty is not, however, violated when a separation is necessary by reason of physical ailments, and when for that reason the marriage relation cannot be continued either in the locality of the home or elsewhere without danger of becoming a hopeless mental wreck. Such are rare and extreme cases, but we are unable to understand from the evidence how the refusal of the defendant to live with her husband as his wife could be construed as a wilful disregard of her duty toward him or their children. His allegation that he proposed through her brother that she live in the vicinity, where she could be constantly near the children, is not supported by any evidence in the record, notwithstanding it is directly put in issue by the answer and return of her brother to the writ, who alleges that the only proposal made by the plaintiff was that she return and live with him as his wife. If there had been such proposal, we doubt very much from the evidence if it would have been a just requirement or proper for her to live where her surroundings would have been a constant reminder of her former unfortunate condition. Upon the facts, it cannot be said that she wilfully deserted her husband and children. Defendant says

that the reason she did not institute legal proceedings to obtain their custody is that her brother was called home sooner than he expected and that she did not feel able to carry on such proceedings alone.  It is not shown that the manner and method of taking the children was criminal under the laws of their domicile, and they were brought into this state for no illegal or unlawful purpose, but, on the contrary, they were so brought by their mother, who was living in this state and who seems to have been acting out of love and affection for them and in an effort to do that which she believed would better their condition.  Such acts were clandestine in so far as they were done without the knowledge and consent of the father, but they were done by a natural parent of good character, moved by pure motives and for what such parent deemed, in the condition of her health and the surrounding circumstances, for their best interest.  Such acts were not so done as to violate the rights of the children, nor were they so repugnant to the rules of equity and good conscience as to stamp her as unsuitable to have their custody and require that their custody be returned to their father.  In Jones et ex. v. Bowman, *supra,* a minor orphan child was spirited away from its domicile in another state from its custodian, and where proceedings were pending for the appointment of the latter as its guardian.  The ·child not being *sui juris,* could not change its domicile nor could it be changed by those who without authority took it away.  The court proceeded to appoint the applicant as guardian who followed the child to this state and instituted habeas corpus as a foreign guardian to obtain the custody of the child against a local guardian who in the meantime had been duly appointed in this state and whose wife, the child's aunt, had assisted in removing the child to this state.  It is clear that the injury, if any, in that case was to the child, and yet it was held by this court that, notwithstanding the child was so clandestinely taken from its custodian at the place of its domicile and brought into this state, the foreign guardian was not entitled to its custody.

It was the children's right to live with both parents and if for any reason they were prevented from doing so, then to live with the one, if otherwise suitable, whose presence, care and attention was most needed in view of their age and requirements. The statement of Muriel, though but thirteen and one-half years, should be considered in connection with all the other evidence in the case. Her evidence shows her to be bright and intelligent, indeed more than ordinarily so for one of her age, and in view of all the evidence and surrounding circumstances her choice was a wise as well as a natural one. In such cases age is not the criterion, but it depends upon the reasonableness of its preference and its intelligence whether an infant has sufficient judgment and discretion to choose for itself. (15 A. & E. Ency. of Law, 186, and cases there cited; Hurd on Habeas Corpus, 532; Church on Habeas Corpus, Secs. 431, 432.) In Chunn v. Graham, 43 S. E. (Ga.), 987, a case like the one before us, the court said: "It was competent upon the hearing to permit the child to state with whom she preferred to live. In many cases such wish ought to turn the scale. The nearer the child approaches fourteen, with the legal right to choose her guardian, the greater the weight to be given to such wish. * * *" Before that time its wish "is not controlling, but may be considered by the habeas corpus judge along with all the evidence as to what is the minor's best interest." Such we think is the general rule, for if the happiness and welfare of the infant is to be consulted nothing could be more potent upon that question than the expression of its preference based upon kindness or unkindness, care or want of care, love and affection or want thereof, and as to the surrounding conditions either with one or the other.

In the case before us the children are with their mother. At the time of hearing, Muriel, who was just approaching the age of fourteen, expressed her wish to remain and live with her mother. She has now reached the age of fourteen, and her wish at this time as to who shall be her guardian is

expressly recognized by statute. She may nominate her own guardian, "who, if approved by the court or judge, must be appointed accordingly." (Sec. 4867, R. S.) While the supervisory power of the court or judge goes to the fitness and suitability of the person so nominated, the statute assumes that the minor having reached the age of fourteen can act intelligently in the matter of selecting her guardian. Eric is of tender years and cannot speak for himself on the subject, but it would be cruel, in our judgment, to take him away from his mother at his age and compel him to live separate and apart from her and from his sister. This court said in Jones et ux. v. Bowman, *supra:* "We are unable to return this case for final determination without references to some of the writings upon that subject and to some showing that the courts have always held that when it is possible a family or those remaining should be kept together * * *." Numerous authorities are there cited in support of this humane rule, which it is not necessary to here discuss. Both children need their mother's care. She is devoted to them and no breath of suspicion rests upon her character either by allegations in the pleadings or in the evidence. She is such a woman as to command their love and respect which they give her. They are attending school and are under her immediate care and ought not to be separated, but, if possible, be kept together. She may not be able to furnish them a good home from independent means of her own, but they are, with a prospect of a continuation of their present surroundings and conditions, well provided and cared for by her brother, who is financially able and willing to do so, and they are being educated and their health is better in this climate than when residing in Esquimalt with their father. It may be conceded that their father is a good man and equally solicitous for their welfare, yet there are many things that he is unable to do personally or that could be done by a nurse or governess and which their mother can do for them. Neither he, nurse or governess could supply the place of their mother. In Redmond v. Redmond, 88

S. W. (Mo.)., 129, the controversy was between the parents over the custody of five children, the eldest age thirteen years and the youngest age five years. The mother had no means of her own to support, care for and maintain the children, and she and the two younger children were living with and being cared for, while the three elder children were being educated in a school where they were away from their mother, at the expense of the maternal grandmother. The case was one of original jurisdiction, and in that respect unlike Sturdevant v. State and Jones v. Darnell, *supra,* which were of appellate jurisdiction. It was held that, although the father, who brought the proceeding, was financially able and morally fit to have the custody of the children, yet he would have to hire a housekeeper to look after their wants. That court said: "We can never consent to the substitution of a hireling to look after these children in the place of their mother," and the children were permitted to remain in the custody of their mother. In Sturdevant v. State, *supra,* the court said: "It is no doubt true that the defendant in error is greatly attached to his child, and the facts as found by the court show that he is in every respect a suitable person to have its care and custody. But when we consider his age and want of experience, we are driven to the conclusion that, personally he could not care for the wants of a child so young and helpless. True, he has means and has employed a suitable nurse, yet so far as we are informed this nurse is a stranger to the child, and of course does not feel that personal interest in its welfare as would be felt by. a near relative." In that case the child was eight months of age and if its helpless condition would not inspire such interest in its welfare by a nurse who was caring for it as would be felt for it by a near relative, much less would such an interest be aroused in a stranger to children who were older, one of whom is a girl who has reached that age where she needs and is entitled to the careful attention, direction and guidance of a mother, and which could not be given by a father. Her mother's presence, interest, care,

love and affection during the formative period of her character and upon which her future health and happiness largely depend, are factors too valuable to be lightly brushed aside and especially in view of her expressed wish and desire to live with her mother.

We are of the opinion that the finding of the trial judge in favor of the father upon the issue as to the best interest and welfare of the children is not supported by the evidence and that the awarding of their custody to him was such an abuse of discretion as to call for a reversal of the judgment and order. Muriel having now reached the age which entitles her to nominate some suitable person to be her guardian, her wishes as to which of her parents, each being suitable, should have her custody should, we think, be respected by the court, in view of her manifest intelligence as disclosed by her testimony. Such being the rule governing this class of cases, it would neither be proper nor right as against her wishes upon a re-trial of the issues to take her from her mother, and Eric, under the rule laid down by this court in Jones et ux. v. Bowman, ought not to be separated from her and his mother. There is, therefore, nothing to be retried. Upon the facts the plaintiff in error was and is entitled to the custody of the minor children, and the defendant in error is entitled to see and visit them at all reasonable times.

For the reasons above stated the judgment is reversed and the case is remanded to the District Court of Sweetwater County with directions to enter judgment in accordance with the views herein expressed.        *Reversed.*

·POTTER, C. J., and BEARD, J., concur.