**Ronald Owen FANNING, Appellant (Plaintiff),**

v.

**Sherry Lynn FANNING, Appellee (Defendant).**

**No. 85–242.**

Supreme Court of Wyoming.

April 10, 1986.

Richard H. Honaker, Rock Springs, for appellant.

Jere Ryckman, Green River, for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

URBIGKIT, Justice.

Ronald Fanning, the father of two boys ages two and four, comes to this court by appeal from a custody order granting custody to the mother, Sherry Fanning, by hearing subsequent to the divorce decree.

We reverse and remand for entry of an order to grant present custody to the father.

Issues stated by the litigants are:

"1. Did the trial court err as a matter of law by failing to consider the best interests of the children in a child custo-dy dispute, and by considering instead only the best interests of the mother?

"2. Did the trial court erroneously apply the Maternal Preference Rule, which was abrogated by this Court in *Fink v. Fink*, 685 P.2d 34 (Wyo.1984), and award custody solely on the basis of gender in violation of W.S. § 20–2–113(a)?"

The trial court, by opinion letter written prior to the custody order from which this appeal was taken, discussed his decision inter alia as follows:

"I have ruled as I have because all evidence indicates that Sherry Fanning has tried to improve herself and her parenting skills and to a considerable extent has done so, and, having done so, is entitled to a chance at raising her own children. However, she must realize that she is not the ideal mother, and must continue to improve. On the other hand, I doubt if there is such a thing as a perfect mother. I also adhere to the theory long espoused by the Supreme Court and that is that children of tender years should be with their mother. In nature, virtually all born animals are raised by their mothers, and human beings are merely a higher form of animal. I realize these children will not have many of the luxuries they now have, but as I have said before that no child has the right to be raised in the lap of luxury.

\*     \*     \*     \*     \*     \*

"This is not a temporary custody order and will not be reviewed except for compelling reasons brought to the attention of the Court."

As demonstrative of the status of the case, the order which granted custody contained the following provisions:

"A. That Defendant continue to attend weekly counseling and weekly STEP parenting classes at Southwest Counseling Service, until such time as Southwest Counseling determines such activity no longer necessary.

"B. That Sweetwater County DPASS continue to supervise and monitor the

Defendant's home as often as it deems necessary, without notifying Defendant in advance of such visits if it so desires, for so long as it deems necessary.

"C. That Defendant will comport herself in a more lady like fashion in the future; not drink to excess; not drive a motor vehicle when drinking; and behave with gentility in the presence of said minor children."

The resolution determined by the trial court was demonstrated by an unwillingness to delay a change of custody until the disposition of this appeal, and a succeeding order was entered on October 11, 1985, on a show-cause proceeding requiring immediate delivery of the children to the mother.

The Wyoming statute which controls custody decisions as incident to a divorce is § 20-2-113; W.S.1977, 1985 Cum.Supp. The basic Wyoming statute was first enacted as Ch. 40, § 14, S.L. of Wyoming 1882:

"The court, in granting a divorce, and also upon pronouncing a decree of nullity of a marriage, may make such disposition of, and provision for, the children as shall appear most expedient under all the circumstances, and most for the present comfort and future well-being of such children; and the court may from time to time afterward on the petition of either of the parents, revise and alter such decree concerning the care, custody and maintenance of such children, as the circumstances of the parents and the benefit of the children shall require."

The law continued unchanged, see § 20-61, W.S.1957, until the domestic relations statute recodification by Ch. 152, S.L. of Wyoming 1977, which is now the present law, § 20-2-113, W.S.1977, 1985 Cum.Supp.

The change from the 1882 law, as found in a 1957 reenactment, involved two clearly evident and substantial changes. The phrase "most expedient under all of the circumstances, and most for the comfort and future well-being of such children" was changed, and, as now found, is, "most

expedient and beneficial for the well-being of the children."

Additionally, a further sentence was added to address a precise question which has developed in earlier Wyoming case law about a maternal preference:

"The court shall consider the relative competency of both parents and no award of custody shall be made solely on the basis of gender of the parent."

Both changes were derived from an Interim Joint Judiciary Committee review of the domestic relations statutes, and were included as Senate File 76, at the 1977 session of the Wyoming legislature. The additional sentence earlier quoted was included by committee amendment from the House Judiciary Committee, Ross Copenhaver, Chairman, after Senate File 76 had passed the Senate, Senate Journal 1977, Senate File 76, p. 112.

Two clear determinations can be made from the language change by review of the changes in accord with the appropriate statutory rule that the legislature did not intend to do a useless thing. This has been the determined law since before statehood:

" * * * It is not to be presumed that congress meant to be engaged in the idle work of phrase making. It is not to be presumed that a legislative body would enact a statute without other purpose than to declare what is already indisputably and confessedly the law." *United States v. Douglas-Willan Sartoris Co.*, 3 Wyo. 287, 288, 22 P. 92, 94 (1889).

See also *State v. Sinica*, 220 Neb. 792, 372 N.W.2d 445 (1985).

(1) Any remaining semblance of a maternal-preference rule was expressly eliminated from Wyoming law. *Fink v. Fink*, Wyo., 685 P.2d 34 (1984).

(2) If the best interest of the child had not been clearly denominated as a test for custody in case construction of the prior statute, the phraseology was clearly changed by this amendment to leave no doubt of legislative intent.[1] See, however,

---

1. The statutory reclamation action of Senate    File 76, enacted by the Wyoming legislature in

*Forbes v. Forbes,* Wyo., 672 P.2d 428 (1983), and *Ayling v. Ayling,* Wyo., 661 P.2d 1054 (1983).

In any event, the legislature in 1977 firmly spoke on the two issues of the best-interest test for child custody as differentiated from parental rights, and equality in evaluation of both parents without gender determination. By this decision, we recognize these legislatively restated standards, and reemphasize what this court only recently said in the opinion by Chief Justice Thomas in *Fink v. Fink,* supra, 685 P.2d at 37:[2]

"* * * The status of such a preference, particularly if it is invoked as a principle of law, is increasingly doubtful. Annotation 70 A.L.R.3d 262 (1976), and the cases cited therein. Our legislature has articulated a contrary policy in § 20–2–113, W.S.1977, in which it is stated in part:

"'* * * The court shall consider the relative competency of both parents and no award of custody shall be made solely on the basis of gender of the parent. * * '"

▮ This court well recognizes its frequently enunciated rule and well-established principle that it will not interfere with the decision of the district court in child-custody questions unless there is a procedural error, or unless there is shown to be a clear abuse of discretion, and, further, that a court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances as is said to mean an error of law committed by the court under the circumstances. *Ayling v. Ayling,* supra; *Bereman v. Bereman,* Wyo., 645 P.2d 1155

(1982); *Martinez v. State,* Wyo., 611 P.2d 831 (1980).

Our attention is then directed to the facts of this action now resulting in a custody controversy between the father and mother.

Following marriage in 1978, two children were born: Jason, born November 13, 1979, and Andrew, born February 27, 1981. Marital separation occurred in December of 1983, and the divorce action was instituted in January of 1984, when the father, by verified divorce complaint, motion for custody order and affidavit, also asked for temporary custody of the two children.

The father at that time was generally engaged in oil field sales work, and had been away from home a considerable amount of time during the marriage, it being obvious from the documentation available that this was not a marriage mandated in heaven.

The mother, as a teenager, was charged with incorrigibility and truancy, was sent to the Girls School in Sheridan, and did not return to her parents' home upon release. She did not finish high school, and, although planning to get her G.E.D., had not done so. Her work history is minimal, with some experience as a maid, but her basic standard of employment is as a night-time barmaid, which employment existed at the time of the last custody hearing.·

The oldest son, Jason, is a healthy, rambunctious child, with no physical ailments or disability except a scar which, by general construction of the evidence, was derived from an intentional burn with a cigarette

1977, illustrates a proclivity to develop case law to substitute rule for reason, thereafter requiring legislation or case reconstruction to afford justice. *Simpson v. Kistler Investment Co.,* Wyo., 713 P.2d 751 (1986); *Nehring v. Russell,* Wyo., 582 P.2d 67 (1978).

An evolutionary period of Wyoming law on custody can be discerned. The early cases starting with *Jones v. Bowman,* 13 Wyo. 79, 77 P. 439 (1904), denied a paternal preference and implicated a principle of best interest. Thereafter, both a maternal preference and a balancing test developed. *Leitner v. Lonabaugh,* Wyo., 402 P.2d 713 (1965); *Ramsey v. Ramsey,* 76 Wyo. 188, 301 P.2d 377 (1956). The law has now

returned again to best interest as a criterion as defined in the present statute. It may be that the applied principle never changed but that, in explaining exercised discretion to affirm the trial court decision, the appellate court said more than was necessary. See Gotlwik, *Determining "Best Interest" of the Child in Divorce Custody Disputes: A Procedural Approach,* 9 Vt.L.Rev. 311 (1984).

2. Ross Copenhaver, who had chaired the House Judiciary Committee in 1977, when the equality amendment was added to the law, was counsel for the father in the Fink case.

by his mother. The younger son, Andrew, had serious medical problems at birth, has a 30 per cent hearing loss, with tubes required for hearing maintenance. He continues to require substantial medical care, and also has a forearm scar consistent with his stated cause that it was an intentional cigarette burn from his mother.

The father's mother and stepfather, Norma and Jack Richardson, moved to intervene for custody in the divorce proceeding, and the motion to intervene was denied by the trial court on the basis that grandparents have no standing under § 20–2–113, to intervene in a divorce action with regard to child custody. Cf. *Nation v. Nation*, 715 P.2d 198 (1986).

The children were placed in the custody of the Division of Public Assistance and Social Services (DPASS), on March 8, 1984, and arrangements were then made for the children to reside at the home of their paternal grandparents, Jack and Norma Richardson, in Pinedale.

DPASS originally became involved on a medical-neglect referral in January, involving the conduct of the mother, and a subsequently filed home-study report of that agency stated:

" * * * Medical neglect was unsubstantiated; however, physical abuse of the children has been substantiated. While in the care of their mother both children have received suspicious injuries in the form of bruises, cuts, and burns similar to cigarette burns. Charges of child endangering are pending against Sherri Fanning."

During the summer of 1985, the father discontinued his oil field employment and moved to the Pinedale ranch to associate with his parents and handle care and custody of his two sons.

The following custody orders were entered:

(1) Pursuant to the original motion for temporary custody, an order was entered January 23, 1984, granting temporary custody to the father.

(2) On February 10, 1984, an amended order was entered, granting alternate two-week custody to the mother and father.

(3) Following motion to modify temporary custody, and based upon physical illnesses of the children after a stay with the mother, an order of March 5, 1984, again granted custody to the father.

(4) On March 8, 1984, custody was placed in DPASS, with provision that the department could make a determination of what placement was in the best interest of the children. In accord with that order, living arrangements were made through DPASS for the care of the children in the residence of the grandparents in Pinedale, which living arrangements continued until the entry of the order from which this appeal is taken. Home studies of the father, mother and grandparents were made in comprehensive detail.

(5) Trial on the divorce and custody issues was held December 11, 1984, followed by decision letter of the trial court wherein temporary custody was awarded to Mr. Fanning, with anticipated physical custody to be vested with Mr. and Mrs. Richardson "who are taking what appears to be excellent care of them with the means to do so."

The court then said:

"Mr. and Mrs. Richardson will cooperate fully with D–PASS. I want it made clear, as I said at the outset, that my sole concern here is the best interests of the children, and if [at] all possible, I would like to see these children eventually restored to one or the other of the natural parents. The only other alternative I see is termination of parental rights, which I would much dislike to do.

"Lastly, the fact that the children if restored to either parent would probably have less in the way of worldly goods is immaterial. No child has a God-given right to be born with a silver spoon in its mouth or to be raised in the lap of luxury. Mr. and Mrs. Richardson are to remember they are acquiring no legal rights to these children and have but temporary physical custody because that seems to be the best solution at the mo-

ment. I will preview the matter six or seven months from now when D–PASS has something to report. Mr. Fanning is granted the divorce, will assume all indebtedness, and the property will be divided between the parties as set forth in Defendant's Exhibit D, unless someone can show me compelling arguments otherwise."

(6) On September 17, 1985, a reconvened hearing was held on the petition of the mother for reconsideration of custody, and then for the first time custody was granted to the mother.

DPASS, which originally had been involved in the child-abuse criminal-charge question, which for some unknown reason was filed and then dismissed by the prosecuting officials, by change of personnel in the Fall of 1985, had come to conclude that the mother was attempting to reconstruct herself, and that she should be given the opportunity for a restoration of custody.

The primary evidence in this case is uncontradicted, since it comes from documents which are a matter of the record by various hearings and pleadings, and by a final stipulated statement of the evidence, since a transcript was not secured.

We do not have a contested-evidence case, but rather a determined-evidence case upon which ultimate conclusions of fact and law are to be derived.

The July 2, 1984, recommendation through the home study conducted by Monnie Mylet Horton, Family/Community Services Specialist, contained the following:

"Considering the social history we have on Sherri and her children and the fact that abuse has been substantiated and charges are pending; and in light of the fact she has no definite plans with regard to supporting her children or to offer them a stable home environment; I cannot recommend the children be returned to the custody of their mother."

Extended testimony of that same witness is also included in the record, and was to a similar effect, with equally negative recommendations for maternal custody being given by Dr. Brian Miracle and Dr. J. Thomas Johnston.

The possible basis for a custody change to the mother could only be derived from the testimony of the social workers of Sweetwater County DPASS, who testified as to the period of time after initial custody had been granted to the father. That testimony was in stark contradiction to the detailed evaluation by the prior DPASS consultant, Monnie Mylet Horton.[3]

File references in addition to the affidavits of the father and the grandfather of abuse and misconduct include: the home study reports of Monnie Mylet Horton; personality inventory tests of Joe Poage; letters by J. Thomas Johnston, M.D., Pinedale Medical Clinic; psychological evaluation by Norman D. Bell, Ed.D.; various other letters of reference; and nine trial witnesses.

This recitation of file material will serve little purpose in immediately identifying and enumerating the variant problems, concerns and difficulties which are included in the evidentiary material. Denominated was the fact that the mother was arrested for drunken driving at a late hour two weeks before the custody hearing, with a resulting altercation with the arresting officer. Since a blood-alcohol test was refused, whether or not a conviction resulted

---

**3.** The insufficiencies of activity investigation and environmental status review, are patently self-evident from a comparison of lack of any evaluation or testimony as to such matters as drinking and relationship with her boyfriend, with the established testimony from other sources. The best-interest-of-the-children test was certainly not demonstrated in the agency investigatory obligation and conclusions.

In a letter to the court dated March 6, 1984, Monnie Mylet Horton concluded:

"I believe that cigarette burns are very serious injuries and believe the children to be in serious danger if they are returned to the custody of their mother."

A look at the photographs is confirmatory. The boyfriend with whom the mother slept in the presence of the children on one occasion and who was accused by the children of beating up and cutting the mother with a knife, had himself been under a restraining order for threatened physical abuse of a prior wife.

at the January 24, 1986 trial, Mrs. Fanning did continue to drive. (The stipulated statement is obviously in error in relating the incident to a date of September 28–29, rather than the correct date of August 29, 1985.)

It is recognized by this court that the state of the record is such that it is hard to tell exactly how much of the record material was initially considered by the court at the divorce trial in September of 1984, or subsequently considered at the show-cause hearing which was held October 11, 1985. The clarity of trial evidence presentation does not afford much comfort when the welfare of two children is intrinsically involved.[4]

However documentation in the record is empirically critiqued by this court, the final stipulated statement of evidence is unquestioned as the evidentiary status of this case for consideration of the welfare-of-the-children test:

(a) Custody with the father, in conjunction with the grandparents' ranching activities in the Pinedale area, afforded a high degree of favorable care and maintenance for the children.

(b) Assignment of custody to the mother in her status as a nighttime barmaid, in conjunction with a history of abuse and alcoholic problems, created at best a questionable arrangement that could only be justified in the absence of an alternative.

We would then discuss, albeit briefly, the two legal issues raised by this appeal.

The trial court specifically stated that he was utilizing a maternal preference for custody decision. This is a mistake of law, and not a matter of discretion. *Fink v. Fink,* supra.

The best-interest requirement causes us concern in reaching a responsibility as an appellate tribunal while appropriately recognizing needed discretion of the trial court.

■ We are concerned about the comment in both opinion letters, wherein the trial court references availability of worldly goods as immaterial.

"No child has a God-given right to be born with a silver spoon in its mouth or to be raised in the lap of luxury."

Every child has a constitutional and a statutorily mandated right to a fair opportunity and a social environment differentiated from an existence like an animal. Otherwise we would be seeking to say that a Rockefeller or a Vanderbilt is obligated to be raised as a child of a slum-born minority. We rely on the thoughtful advice of Justice Knight in the early best-interest case of *Jones v. Bowman,* 13 Wyo. 79, 77 P. 439, 441, 442 (1904), "the interest of the child * * * should be the sole consideration here," and "that he has the means to support and educate the child." See also *Butcher v. Butcher,* Wyo., 363 P.2d 923, 924 (1961):

"One of the main factors to be considered herein is the financial and economic condition of the respective parties

---

**4.** This may well include a letter from Dr. J. Thomas Johnston dated October 9, 1985, submitted with an affidavit for trial court consideration, wherein the following was said:

"This letter is submitted as a strong support to maintain the current living situation for Drew and Jason Fanning.

"When I first started caring for these little boys about 2 years ago, they were ill-behaved, hostile, suspicious, aggressively difficult to handle, and exhibiting signs of physical abuse as evidenced by healing wounds they described as cigarette burns administered by their mother.

"Since the court placed them in the foster situation of their grandparents, (Jack/Norma

Richardson), these boys have blossomed into well-behaved (albeit very active), polite, pleasant children that have the normal problems of their age. It should be noted that frequently after maternal visits, their personalities revert back to old habits.

"I would beg the Court not to return these children to an environment that has been shown to be detrimental to their social development and physical well-being; rather, leave them with the Richardsons and their natural father, Ron Fanning.

"*Would one's conscience be comfortable should an ill-advised decision now lead to delinquencies in these boys in 10–15 years?*" (Emphasis added.)

because of the fact that the children must be fed and clothed."

■ We believe that best interest is attendant with educational opportunity and stable environment for which economic resources are not insignificant. This court does not intend to develop another case justification by this comment which might later become a principle of custody determination. Financial resources may not even be a reasoned factor in the best-interest determination in some specific cases. The best-interest criterion of our law as the promise of our society should evoke every relevant factor, with the weighting to be vested in the discretion of the trial court.

A comprehensive review of this entire record is not a Saturday-night exercise in desired experience. Both the already experienced human tragedy, and the future life experience danger are only too pervasively displayed. We cannot comfortably conclude that our system of justice can gamble with the potential well-being of children of young age in attempted social rehabilitation of a problematic parent. Children should not be social pawns in the parenting competition.

The intrinsic and frequently expressed rule of primary interest of the child has certainly been clearly enunciated in continued case recitation. *Leitner v. Lonabaugh*, Wyo., 402 P.2d 713 (1965); *Henson v. Henson*, Wyo., 384 P.2d 721 (1963); *Laughton v. Laughton*, 71 Wyo. 506, 259 P.2d 1093, 43 A.L.R.2d 351 (1953); *Stirrett v. Stirrett*, 35 Wyo. 206, 248 P. 1 (1926); *Ex parte Madson*, 25 Wyo. 338, 169 P. 336 (1917); *Tytler v. Tytler*, 15 Wyo. 319, 89 P. 1 (1906); *Jones v. Bowman*, supra.

> "It is evident from these statutes and from the decisions of courts uniformly that in awarding the custody of children in these proceedings the leading and paramount question is the welfare and benefit of the children, and parental wishes, rights, and affections must in all cases give way to this paramount issue." *Ex parte Madson*, 169 P. at 337.

See Wallerstein, *The Overburdened Child: Some Long-Term Consequences of Divorce*, 19 Colum.J.L. & Soc.Probs. 165 (1985); Bartlett, *Rethinking Parenthood as an Exclusive Status: The Need For Legal Alternatives When the Premise of the Nuclear Family Has Failed*, 70 Va.L. Rev. 879 (1984). See also Annot., 25 A.L.R.3d 7, Award of custody of child where contest is between child's father and grandparent; Annot., 31 A.L.R.3d 1187, Award of custody of child where contest is between child's parents and grandparents; Annot., 29 A.L.R.3d 366, Award of custody of child where contest is between child's mother and grandparent; Annot., 10 A.L.R.4th 767, Award of custody of child where contest is between natural parent and stepparent. The natural right versus best interest conflict is inevitably evidenced.

> "In the twentieth century, and especially in the past decade or so, numerous changes have occurred in the rules governing child custody decisions and the procedures used in child custody litigation. An increased recognition of children's rights has affected the child custody process. * * * The child's psychological and emotional well-being has increased in importance as a factor in determining the best interests of the child, and in many instances psychological experts have been brought into the courtroom in the custody context. * * * A growing recognition of children's need for stability and continuing relationships has led to some changes in the standards governing modification of custody and visitation decrees * * *." 1 McCahey, Child Custody & Visitation Law and Practice, Ch. 1, § 1.03, p. 1–25.

See *In the Interest of Tremayne Quame Idress R.*, 286 Pa.Super. 480, 429 A.2d 40 (1981).

A veritable avalanche of recently considered case law, law journals, and sociological and psychological reviews has come to recognize two singularly important concerns about the mental stability of individuals as derived from their childhood environment. First, it is generally considered today that a significant portion of the environmental relationships from which devel-

opment results is occasioned by experiences in the first few years of life. Unfortunately, the die is frequently cast in the tragedy and difficulty of those most formative years.

Secondly, stability in custody is probably more important than anything else. A continuing stable environment is critically important for emotionally balanced development. Eitzen, *A Child's Right to Independent Legal Representation in a Custody Dispute*, XIX Fam.L.Q. 53 (1985).

■ Premised on the foregoing, we determine that this case should be reversed and remanded for entry of an order granting custody to the father.

Reversed and remanded for an entry of an order in conformity with this opinion.

CARDINE, Justice, specially concurring.

I concur in the above case but do not buy into the suggestion that a parent who first obtains temporary custody should be awarded permanent custody because they have established a stable environment for the children. Nor do I accept the proposition that wealth, educational advantages and a stable environment are the most important factors to be considered. Perhaps the sincere love of a parent who helps and encourages a child and who does not abuse that child is as important even in the absence of wealth. It is abundantly clear that sociometry and psychiatry are not exact sciences, and it is not infrequent that children raised in difficult circumstances do very well while children having all of the advantages do poorly in society. There are no easy answers. We simply consider a totality of all the circumstances in arriving at what we perceive to be in the best interests of the children.

BROWN, Justice, dissenting.

It may be that the interests of the two children would best be served if they were placed in the home of their paternal grandparents.[1] However, for the majority to make that determination it was necessary to weigh the evidence, determine the credibility of the witnesses and substitute its judgment for that of the district judge. The manner in which the majority makes its determination is contrary to established appellate rules. I respectfully suggest that the majority has ignored some basic appellate rules, which follow.

> We accord great deference to the factual determination of the trial court. The trial court is in a better position to judge demeanor, truth and veracity of witnesses, and also to determine the credibility and the value of their testimony. On appeal, the supreme court presumes findings of fact to be correct and will not disturb them absent a finding that they are clearly erroneous or contrary to the great weight of the evidence.

> On appeal, the reviewing court examines the evidence in the light most favorable to the prevailing party, presumes that it is true, and leaves out of consideration entirely the evidence presented by the unsuccessful party that conflicts with the successful party's evidence. Furthermore, the reviewing court may make every favorable inference that may reasonably and fairly be drawn from the evidence produced by the successful party. A reviewing court cannot substitute its judgment for that of the trial court, whose judgment must be sustained unless clearly erroneous, manifestly wrong, or totally against the evidence.

> The appellate court will not set aside the trial court's findings merely because it might have reached a different result.

See *Yates v. Yates*, Wyo., 702 P.2d 1252 (1985); *Lebsack v. Town of Torrington*, Wyo., 698 P.2d 1141 (1985); *Scott v. Fagan*, Wyo., 684 P.2d 805 (1984); *State ex rel. Wyoming Workers Compensation Division v. Colvin*, Wyo., 681 P.2d 269 (1984); *Consolidated Freightways v. Drake*, Wyo.,

1. In reversing this case the majority granted custody to the appellant father. In reality, however, custody will be with the grandparents, as it was before trial. Evidence at trial showed that the children were living in the grandparents' home. There was no evidence that appellant could provide any type of a home except through his mother.

678 P.2d 874 (1984); *Doenz v. Garber,* Wyo., 665 P.2d 932 (1983); *City of Rock Springs v. Police Protection Association,* Wyo., 610 P.2d 975 (1980); *Arch Sellery, Inc. v. Simpson,* Wyo., 360 P.2d 911 (1961).

Under the standards of appellate review set out above, appellee produced an abundance of evidence to justify the district court's determination regarding custody.

An employee of the Sublette County Department of Public Assistance and Social Services (D–PASS) testified that the interaction between appellee Sherry Fanning and her children had improved and that she had developed the skills to properly raise the children and provide for their needs.

A staff member of the Sublette Community Mental Health Center in Pinedale testified that appellee's parenting skills had improved and that she is willing to learn. He further testified that mothers generally have more influence on their children, and appellee had a positive influence on her children.

Another D–PASS employee testified that appellee met all obligations imposed on her, that her interaction with the children was good, and that she could care for the children.

A counselor at Southwest Counseling in Green River testified she had been working with appellee since March, 1984, and saw significant progress in her emotional and psychological makeup, and that appellee was now an effective parent. She recommended that appellee be the custodial parent.

Appellee testified she had been taking parenting classes, had a job, was self-supporting, and had her own apartment. Her work hours were designed so she could return the children to Pinedale on Sunday and allow her to go to Pinedale to visit the following Friday. Her activities with the children included camping, going to the zoo, Lagoon, and Salt Lake City.

Appellant contends that the children were bruised or scuffed when they returned from visiting their mother. However, appellee and other witnesses testified that the children were also bruised or scuffed when they had been with appellant or the grandparents. In appellee's estimation the bruises and scuffs were the result of rambunctious, healthy children, quite normal and ordinary.

According to appellate rules set out, supra, the trial court was entitled to believe the favorable evidence produced by appellee and disregard the evidence produced by appellant.

The majority determined that the trial court utilized maternal preference for its custody decision. If that was the *sole* basis for the court's decision the criterion would be incorrect, according to § 20–2–113, W.S.1977 and *Fink v. Fink,* Wyo., 685 P.2d 34 (1984). My review of the record and reading of the trial court's opinion letter, however, lead me to believe that gender was only *one* consideration and not the *sole* consideration employed by the trial court to arrive at its decision. A trial court is not precluded from considering gender as *one* of the factors in custody determinations.

If the trial court did, in fact, improperly use maternal preference as the *sole* basis for its custody award, the case should be remanded with instruction to reconsider the case under correct principles of law. It seems reversal with instructions to enter an order granting custody to appellant is inappropriate.

I would affirm the trial court.